[No. S034105. Nov. 23, 1994.]

WILLET H. BROWN et al., Plaintiffs and Respondents, v. JOSEPH GREEN et al., Defendants and Appellants.

## COUNSEL

N. Mark Lam, Lawrence A. Agran, Moreno, Purcell & Schindler and Hermez Moreno for Defendants and Appellants.

Selman, Bretiman & Burgess, Jeffrey C. Segal and Murray M. Sinclair as Amici Curiae on behalf of Defendants and Appellants.

Sandler & Rosen and Charles L. Birke for Plaintiffs and Respondents.

## OPINION

**ARABIAN, J.**—We granted review to consider the effect of the developing public awareness of environmentally hazardous building materials, and the often substantial cost of their abatement, on traditional rules allocating, as between lessor and lessee, the duty to make repairs and alterations to the leasehold required to comply with laws affecting commercial property. We conclude that settled and well-understood legal rules for determining which party has assumed the burdens of compliance and repair continue to yield fair and reasonable results when applied to leases of nonresidential property presenting abatement of hazardous materials issues.

Disputes between landlords and tenants of commercial property over responsibility for hazardous materials abatement are not, in other words, unique or so extraordinary in nature as to require special rules governing their resolution. In most cases, however, they *do* require a court presented with such a controversy not only to construe the relevant lease terms—terms that presumptively reflect the parties' intent—but to assess the result yielded by that analysis in light of established, judicially developed criteria designed to confirm the text-based conclusion that the parties agreed that the lessee would assume certain (often substantial) risks. Here, given a narrowly drawn compliance with laws clause, the absence of a lease provision expressly allocating responsibility for the abatement of environmentally hazardous materials, and a resultant ambiguity as to how the parties intended to allocate responsibility for compliance with government-ordered alterations unrelated to the lessees' use, we apply these established factors and conclude that the parties agreed the lessee would assume the burden of removing asbestos-laden materials from the building as required by a government abatement order.

We underline the context-dependent nature of both the inquiry and the result in cases such as this. We deal in this case with the long-term lease of

an entire warehouse-like building by sophisticated business partners who had substantial experience in leasing commercial property: lessees who were on written notice of at least the *potential* for asbestos contamination prior to executing the lease, who inspected the building and elected not to investigate the possible presence of hazardous materials before negotiating and signing an agreement that by its terms shifted the major risks of property ownership to the lessee, negated any repair obligations on the part of the lessor, and omitted any representations respecting the condition of the property. In addition, the cost of complying with the mandated work, although substantial in absolute numbers, is less than 5 percent of the total rent payable over the life of the lease.

Under these circumstances, we have no difficulty in concluding that the Court of Appeal was correct in deciding that the lessees agreed to accept responsibility for the government-ordered abatement of asbestos-containing materials. As we explain, however, such determinations are usually closely tied, not only to the terms of the lease itself, but to the context in which it is made, assessed in light of a handful of factors designed to elucidate the probable intent of the parties. Contrary to the result we reach in this case, even though a lease may by its terms require the lessee to be responsible for *all* repairs and alterations, without limitation, the legal and practical scope of that duty may well be less, especially where a *short-term* commercial lease is at issue and the cost of compliance is more than a small fraction of the aggregate rent reserved over the life of the lease. Similarly, where questions regarding the duty to abate arise in a case presenting unforeseeable or hidden defects or conditions, the result may well be the opposite of the one we reach in this case.

Together, our opinions in this case and in *Hadian* v. *Schwartz* (1994) 8 Cal.4th 836 [35 Cal.Rptr.2d 589, 884 P.2d 46], also filed today, illustrate the relationship between the literal text of a nonresidential lease and the result yielded by applying these interpretive factors. In *Hadian,* we construe a preprinted, *short*-term lease with terms virtually identical to the one at issue in this case and conclude that, contrary to the purport of language placing an unqualified responsibility on the lessee for all building alterations and repairs, the conclusion arising from the literal text of the lease is negated by a consideration of the circumstances surrounding its execution. We reason in that case that, despite the unqualified language of the lease, the lessor rather than the lessee is responsible for a municipally ordered seismic upgrade of the leased building, at a cost that is almost one-half of the total rent payable over the life of the original lease and option combined.

Thus, although broadly applicable criteria for determining the repair and compliance with laws obligations of the parties to a nonresidential lease can

be articulated, it does not follow that the outcome in a particular case can be easily forecast on the basis of the text of the lease alone. Each agreement must be evaluated in light of its individual terms under generally applicable contextual criteria and the principle of reasonable construction.

I

In 1984, Willet H. Brown purchased a 45,000-square-foot building at 8921 Venice Boulevard in Los Angeles, which he immediately leased to Hillcrest Motor Company, a West Los Angeles Cadillac dealership of which Brown was president and chief executive officer, for use in preparing automobiles for delivery to buyers. After he withdrew from the new car business in late 1985, Brown began looking for a potential lessee for the Venice Boulevard property; he enlisted a real property brokerage firm, Coldwell Banker, to find a tenant and broker the lease transaction. In April of 1986, Joseph Green, a partner in a retail furniture business with between 10 and 20 outlets in the Los Angeles area, all of which operated out of leased premises and grossed cumulative annual revenues of between $10 and $20 million, saw a listing for the property and made inquiries. The Green partnership later retained its own broker to facilitate lease negotiations with Brown's broker.

On May 8, 1987, following a discussion of terms between the two brokers and Green, Green and another partner signed on behalf of the partnership a two-page, preprinted document entitled "Proposal to Lease Industrial Space," given them by a Coldwell Banker agent, for Brown's consideration. At the foot of the second page of the proposal, just below Joseph Green's signature, appeared the following boxed text, in what appears to be 10-point type:

"CONSULT YOUR ADVISORS—This document has been prepared for approval by your attorney. No representations or recommendation is made by Coldwell Banker as to the legal sufficiency or tax consequences of this document or the transaction to which it relates. These are questions for your attorney. [¶] In any real estate transaction, it is recommended that you consult with a professional, such as a civil engineer, industrial hygienist or other person, with experience in evaluating the condition of the property, including the possible presence of asbestos, hazardous materials and underground storage tanks."[1]

At his deposition, Green testified that he had inspected the building by walking through it, had understood the boxed text, and had made a "deliberate" decision not to retain a professional to inspect the property for

[1]In addition to the mention of asbestos made in the lease proposal, Coldwell Banker had already sent Brown a form entitled "Notice to Owners, Buyers and Tenants Regarding Hazardous Wastes or Substances and Underground Storage Tanks" in 1986, soon after obtaining the listing on the property. That notice provided information concerning potential

environmental hazards; the trial court made a finding of fact to that effect in its judgment. After additional negotiations between Brown, his son Michael (a vice-president of Hillcrest designated by Brown to oversee the lease transaction), and their broker and lawyer, and the Green partnership and their broker and lawyer, the parties reached agreement on June 25, 1987, and signed a written lease agreement. That document, a preprinted, six-page form published by the American Industrial Real Estate Association, was modified by the parties by several strike-throughs and interlineations and a three-page, typewritten "Addendum to Standard Industrial Lease—Net" attached to the modified form lease agreement; each page of the lease bore the initials of the signatories.

As modified and signed by the parties, the lease provided for a term of 15 years at a monthly rent of $28,500; the lessees agreed to pay the annual property taxes and to obtain and pay the premiums for liability (but not casualty) insurance on the building. A handful of other lease provisions are material in resolving the question presented in this suit. Paragraph 6.2(b), entitled "Compliance with Law," provided that *"Lessee* shall, at Lessee's expense, comply promptly with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements in effect during the term or any part of the term hereof, *regulating the use* by the Lessee of the premises . . . ." (Italics added.) In addition, paragraph 7.1 of the lease, "Maintenance, Repairs and Alterations," provided that *"Lessee* shall keep in good order, condition and repair the Premises and every part thereof, *structural* and non-structural (whether or not . . . the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises) including, without limiting the generality of the foregoing, all plumbing, heating, air-conditioning." (Italics added.) Paragraph 7.4 of the lease purported to limit the Lessor's obligations by providing that "Except for the obligations of Lessor under paragraph 9 [specifying the obligations of the parties in the event the building was destroyed], it is intended by the parties hereto that *Lessor* have *no obligation in any manner whatsoever, to repair and maintain* the Premises nor the building located thereon nor the equipment therein, whether *structural* or nonstructural, *all* of which obligations are intended to be that of the *Lessee* under Paragraph 7.1 hereof. . . ." (Italics added.)

In addition, subparagraphs 6.2(a) and 6.3(a) of the form lease agreement, by which the lessor warranted compliance with applicable laws and the condition of the property on the date the lessee took occupancy, were crossed out by the parties. Last, the lease set forth provisions requiring the

---

legal liability of owners and tenants of property containing hazardous materials, including asbestos.

lessee to indemnify and hold harmless the lessor against any claim arising from the use of the property during the term of the lease. According to the evidence, apart from the import of the notice appearing at the foot of the lease proposal, at the time the lease was executed, neither party had actual knowledge or reason to believe that the building contained asbestos, and the parties discussed neither that possibility nor, if discovered, which of them would bear the responsibility for its abatement; the trial court made an express finding of fact to that effect.

Less than two years after taking possession of the property and opening a retail furniture store, the Green partnership suffered business reverses at the Venice Boulevard location. In March of 1989, the partners held a liquidation sale and sublet the entire building to Green's son Ricky and his business partner, who continued to operate a retail furniture store under a new name. In the fall of that year, in the course of a routine inspection of the building, the county Department of Health Services (Department) found that debris containing friable asbestos had flaked onto the floor and furniture in the store's showroom.[2] Ambient air samples of the interior of the building showroom were positive for the presence of airborne asbestos fibers at levels deemed harmful to humans. Soon after the inspection, the Department served the subtenants with a notice of asbestos contamination, advising them of its hazardous nature, and directing that it be abated; a copy of the Department's notice was mailed subsequently to Brown.

There ensued a period of additional monitoring and sampling of the showroom and other areas of the building by private consultants independently retained by Brown and Ricky Green. Both of these studies confirmed the Department's findings by documenting the presence of asbestos-laden particles on the showroom floor and adjacent areas. Both studies also concluded that the hazardous debris had flaked from asbestos-containing fireproofing material sprayed on the structural beams supporting the roof of the building and that the flaking itself, a condition described as "delamination," was apparently caused by the installation of track lighting on the ceiling of the showroom by the lessees, by frequent striking of the surface of the asbestos containing material in the movement of furniture stored on the building's mezzanine, by vibrations of the building induced by customer use of the roof parking area, and by the failure to repair a leak in the roof, water from which had soaked into and degraded the fireproofing material, causing it to disintegrate.

Amid charges and countercharges by the parties to the lease over who was responsible for arranging for and financing the cost of removing the asbestos laden material, the subtenants converted the retail furniture operation by

---

[2] According to the American Heritage Dictionary of the English Language (3d ed. 1992) at page 727, "friable" means "readily crumbled."

moving the sales and showroom into what had been the warehouse portion of the building, and sealing off the area subject to the flaking debris. Ricky Green also sublet a small portion of the newly converted warehouse area. Although Ricky Green and his partner, as subtenants, paid rent on the property directly to Brown from April of 1989 to May of 1990, thereafter neither the Green partnership nor the subtenants paid any rent for the use of the building, which Ricky Green and his partner continued to occupy; as of the date of trial, the county had not pursued abatement proceedings against the site and no asbestos cleanup work had been undertaken.

Having failed to settle his differences with the lessees over responsibility for the asbestos cleanup, Brown filed this action against Green and his partners in November of 1990. The complaint sought as damages accrued rent (totaling $504,278.37, including property taxes, on the date judgment was entered) and the cost of the environmental cleanup, estimated by plaintiff's experts at $251,856, together with attorney fees as provided in the lease agreement. By agreement of the parties, the matter was tried before a superior court judge on a record consisting of stipulated facts, excerpts of deposition testimony, and documentary exhibits. After reviewing the record and hearing oral argument, the trial judge made findings of fact and filed a memorandum decision. Relying principally on our opinion in *Glenn R. Sewell Sheet Metal, Inc.* v. *Loverde* (1969) 70 Cal.2d 666 [75 Cal.Rptr. 889, 451 P.2d 721] (*Sewell*), the trial court concluded that the language of the relevant lease provisions allocated responsibility for asbestos removal and cleanup to the lessees; the court rejected the claim of the Green partners that because the lease did not expressly refer to the risk of asbestos or other environmental hazards, the parties had made no agreement with respect to that subject. The Court of Appeal affirmed the judgment of the trial court, concluding that our decision in *Sewell* was dispositive. We then granted the lessees' petition for review of the Court of Appeal judgment. We affirm.

## II

### A

We begin with an account of our reasoning in *Sewell, supra,* 70 Cal.2d 666. In 1953, the Loverdes entered into a multiyear lease (with an option to renew) of property for use as an automobile repair shop. With the consent of the lessor, the Loverdes converted the property into a trailer park, using an on-site septic system to dispose of waste. Sometime later, Sewell sublet the entire property for the remaining three years of the option, intending to continue operating the trailer park. During the term of Sewell's sublease, county officials determined that the septic system was in danger of failing;

they ordered Sewell to connect to a nearby public sewer or to cease using the property as a trailer park. After investigating the cost of complying with the county's order and finding it beyond his means, Sewell evicted his tenants, closed the park, and abandoned the property.

Sewell later sought declaratory relief to the effect that the Loverdes, rather than he, were responsible for payment of the accrued rent. The Loverdes cross-complained for the back rent and Sewell defended on the ground that the duty of complying with the county's order to connect to the public sewer fell on them. In an opinion for a unanimous court, Chief Justice Traynor held that under the terms of the lease and sublease, Sewell had the duty of complying with the county's order to cease using the septic system and connect to the public sewer and was thus liable for payment of the back rent. We reasoned that although neither party to a commercial lease owes a duty to *repair* leased property in the absence of an agreement allocating that responsibility, "[a] different conclusion must be reached . . . when preventative or reparative actions are required by laws and orders governing the premises and their uses. In such a case public policy requires that someone at all times be obliged to comply with such laws and orders, and parties to a lease will not be permitted to create a hiatus in their respective duties of compliance . . . . Since the property owner is initially under the duty to comply with all laws and orders, he, as lessor, remains subject to that duty unless it is assumed by the lessee." (*Sewell, supra,* 70 Cal.2d at p. 672.)

Our opinion noted that there are two principal ways in which a lessee can assume the duty of compliance with laws or government orders requiring the repair or alteration of commercial property. The first is by "voluntarily put[ting] the premises to uses different from those to which they were put before the creation of his tenancy, and thereby caus[ing] the premises to fall within the scope of existing laws not previously applicable to the premises . . . ." (*Sewell, supra,* 70 Cal.2d at p. 672, fn. omitted.) Without such a rule, we noted, a lessee would "have the lessor at his mercy." (*Id.* at p. 673.) A lessee's responsibility for complying with laws may also be the subject of negotiations between the parties to the lease, and may be transferred from the lessor as an obligation undertaken by the lessee by agreement. Even in such cases, however, there is an implied limitation on the scope of the lessee's burden. "[T]he general rule is that a lessee's *unqualified* covenant to comply with applicable laws, *standing alone*, does not constitute an assumption of the duty to comply with those laws that require curative actions of a '*substantial*' nature." (*Id.* at p. 674, fn. omitted, italics added.)

Applying these principles to the lease before us in *Sewell, supra,* 70 Cal.2d 666, we noted that although the lessee had expressly agreed to comply with

applicable laws, that covenant alone did not encompass the repairs at issue if they qualified as "substantial." We were not, however, required to apply the six factors used by the courts (and enumerated in *Sewell, supra,* at pp. 674-675, fn. 10 of our opinion)[3] to determine whether the county-mandated alterations were "substantial," in light of *additional* obligations assumed by Sewell under the lease agreement. Because Sewell represented that he had examined the property and knew its condition, and because the lease relieved the lessors of any obligation to repair or maintain the property, we concluded that "[i]n the absence of a covenant by the Loverdes to repair or maintain the improvements, their only obligation in this respect would arise from the duty to comply with applicable laws." (*Id.* at p. 675, fn. omitted.) That circumstance, however, led us to conclude that the lessor's disclaimer of any obligation to repair or maintain the property "can be given effect only by interpreting [the lease provision] to relieve the [lessors] of any duty to take those 'substantial' curative actions required by law . . . ." (*Ibid.*)

Importantly, we looked to the *nature* of the lessee's use of the property as confirming our conclusion based on the text of the lease provisions alone. Any doubt that Sewell had agreed to assume the risks of compliance and repair was dispelled, we reasoned, "by a consideration of the character of the premises involved." (*Sewell, supra,* 70 Cal.2d at p. 675.) In light of the nature of trailer parks—the essentials of which consist of ground space, trailer pads and utilities, including sewer facilities—"one who intends to operate a trailer park must know that laws respecting and regulating such facilities would be of primary importance to him and would be those most obviously included in a clause requiring compliance with all applicable laws." (*Id.* at p. 676.)

### B

To both the trial court and the Court of Appeal, the lease terms at issue here and those parsed in *Sewell, supra,* 70 Cal.2d 666, were sufficiently alike to make our analysis in *Sewell* dispositive. Relying wholly on similarities in the texts of the two leases, and without discussing either the scope of the compliance with laws clause or the nature of the lessees' use, the Court of

---

[3]Our opinion recognized that the rule and its associated factors "also appl[y] to covenants to repair or maintain." (*Sewell, supra,* 70 Cal.2d at p. 674, fn. 10.) The factors themselves are discussed extensively, *post,* beginning at page 830. They consist of "(1) the relationship of the cost of the curative action to the rent reserved, (2) the term for which the lease was made, (3) the relationship of the benefit to the lessee to that of the reversioner, (4) whether the curative action is structural or non-structural in nature, (5) the degree to which the lessee's enjoyment of the premises will be interfered with while the curative action is being undertaken, and (6) [in cases involving compliance with laws or orders] the likelihood that the parties contemplated the application of the particular law or order involved." (70 Cal.2d at pp. 674-675, fn. 10.)

Appeal concluded that "[u]nder *Sewell*, the lease before us can only be read to transfer to the tenant the duty to abate the asbestos." Although we agree that the duty of compliance was transferred from the building owner to the lessees, we reach that result by a route different from the logic of the lease terms themselves that the Court of Appeal purported to deduce from our opinion in *Sewell*.

It is true that the compliance with laws clauses in both cases are, in substance, identical—both require the lessee to comply with laws, orders, etc., regulating the lessee's *use* of the property.[4] The distinguishing feature of this case, however, is that, unlike *Sewell*, *supra*, 70 Cal.2d 666, here it was not the lessee's *particular use* of the property that led to the government's compliance order. In *Sewell*, on the other hand, we relied on the fact that it was the lessee's use of the property *as a trailer park* that led to the county's demand that he modify the existing waste disposal system. Indeed, we went so far as to observe in support of our holding that, as the lessee of a trailer park, Sewell "must [have known] that laws . . . regulating such [waste disposal] facilities would be of primary importance to him and would be those most obviously involved in a clause requiring compliance with all applicable laws." (*Id.* at p. 676.)

Unlike the situation in *Sewell*, *supra*, 70 Cal.2d 666, the lease at issue here does not contemplate a use of the property by the lessee of the sort likely to trigger a municipally ordered hazardous materials cleanup. It is clear from the record that the substantial cause of the flaking of the asbestos laden material was activity within the building that would have been typical of virtually *any* occupant, including the predecessor dealer preparation work undertaken by Hillcrest Motor Company. Given these characteristics, it also follows that, unlike the lessee in *Sewell*, *supra*, 70 Cal.2d 666, the Green partnership cannot reasonably be charged with notice, arising from "the character of the premises involved," that the "laws respecting and regulating [asbestos abatement in] such facilities would be of primary importance to [them] and would be those most obviously involved in a clause requiring

---

[4]A comparison of the relevant portions of the text of the compliance clauses in both leases is instructive. In *Sewell*, *supra*, 70 Cal.2d 666, the compliance clause provided that the tenant "agrees that he will occupy and dispose the leasehold estate in a manner commensurate with the requirements and limitations imposed by said basic lease and by the requirements of applicable, federal, state, county, city and district laws, ordinances, rules and regulations pertaining to any and all segments of the operations and uses to which the property may be subjected or put." (*Id.* at p. 674, fn. 9.)

As noted, *ante*, the lease at issue here contains the following compliance with laws clause (par. 6.2): "Lessee shall, at Lessee's expense, comply promptly with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements in effect during the term or any part of the term hereof, regulating the use by the Lessee of the Premises . . . ."

compliance with all applicable laws." (*Id.* at pp. 675-676.) Because the lessee's particular use of the property here is *not* one that triggered the county's abatement order, unlike the use at issue in *Sewell,* it lies outside the literal text of the compliance with laws clause of the lease.

As the Court of Appeal's reasoning in this case illustrates, however, our opinion in *Sewell, supra,* 70 Cal.2d 666, is apt to be misinterpreted as one which, in the search for the parties' intent, exalts a text-bound logic over a close consideration not only of the terms of the lease but of the circumstances surrounding its making. It is true that we determined in *Sewell* that effect could be given to the lessor's disclaimer of any responsibility for the condition of the property only by concluding that the lessee had agreed to assume the burden of the county-ordered alterations, *and* that we appeared to reach that conclusion solely on the basis of the interlocking provisions of the lease itself. But it is important to recognize that that textual inference arose in a context in which the lessee had agreed to comply with applicable laws affecting *his use* of the property and *continued a new use* begun by the Loverdes, one that by its very nature triggered the alterations ordered by the county. *Sewell's* conduct, in combination with that of his predecessor in interest, thus satisfied *both* of the conditions by which a lessee may assume the burden of complying with government-ordered alterations, that is, putting the premises to a different use and undertaking the obligation of compliance by agreement. (See *Sewell, supra,* 70 Cal.2d at pp. 672-673.) Equally important, our opinion in *Sewell* in fact gave substantial weight to the circumstances surrounding the making of the lease, observing, as we have noted above, that as the lessee of a trailer park, Sewell must have been aware of the importance of waste disposal facilities in such an enterprise and the likelihood that a compliance with laws clause would embrace such matters.[5] (70 Cal.2d. at p. 676.) These considerations are decisive in distinguishing the lease at issue here from the one we considered in *Sewell.*

---

[5]Indeed, our reasoning in *Sewell, supra,* 70 Cal.2d 666, is open to the charge of internal inconsistency. While we acknowledged the "general rule" that a lessee's unqualified covenant to repair does not, standing alone, encompass "substantial" curative actions (*id.* at p. 674), and described the six factors that "offer insight into the probable intent of the parties" (*id.* at p. 674, fn. 10), we declined to apply those factors in light of other, unqualified, provisions of the lease. (*Id.* at p. 675.) Despite this conclusion, however, we relied explicitly on the nature of the subtenant's use as clinching our conclusion, since it "dispelled" "[a]ny doubt . . . that Sewell assumed the risk of conforming the sewer system to the governmental requirements . . . ." (*Id.* at p. 675.) Thus, we not only considered the character of the property and its use by the tenant (two of the six factors enumerated in fn. 10), but evaluated the sixth factor itself—the likelihood that the parties contemplated the application of the particular law or order—in justifying our result. We reconcile these seeming deviations on the basis of the practical, commonsense proposition that a tenant is responsible for government-ordered alterations when he either introduces a new use that triggers the order at issue or agrees to accept responsibility for government-ordered alterations arising out of a particular use of the property.

Because the lessees' use of the property in this case lies outside the literal scope of the compliance with laws clause, it is unclear from that provision, standing alone, how the parties intended to allocate the risk of compliance with respect to government orders arising from property conditions *unrelated* to a particular use by the lessee. In the face of that ambiguity, we may properly consider other relevant provisions of the lease as well as the factors employed by the courts to determine the intent of the parties to a nonresidential lease, factors that, in the words of our opinion in *Sewell*, "offer insight into the probable intent of the parties" "despite the use of unqualified language" in the lease. (*Sewell, supra*, 70 Cal.2d at p. 674, fn. 10.)

## III

## A

Although the Green partnership neither agreed expressly to comply with laws *not* regulating their use of the property, nor used the building in particular ways that triggered the county's asbestos abatement order, it *did* agree to a duty of repair that is, on its face, virtually global in scope. In combination with other features of the lease, the extent of that obligation strongly suggests that the parties intended to transfer to the lessees substantially *all* of the responsibilities of property ownership, including the duty to comply with the county-ordered asbestos cleanup.

 Lessees urge us to adopt the contrary view with respect to the duty to comply with *government-mandated* alterations. They argue that, because the compliance clause of the lease *only* obligates them to comply with laws affecting their particular *use* of the property, and because the county's order mandating the replacement of the asbestos-containing material applies to *any* occupant of the building, the abatement order is outside the scope of paragraph 6.2 of the agreement and that is the end of the matter. (See, e.g., *Bush Term. Assoc.* v. *Federated Dept. Stores* (1980) 73 A.D.2d 943 [424 N.Y.S.2d 28 [Environmental Protection Agency requirement that new sewer lines be installed to abate dumping of raw sewage was responsibility of lessor under lease provision requiring lessee to comply with laws affecting its use of property since *any* occupancy would have required installation of a new sewer system]; *Wolf* v. *2539 Realty Associates* (1990) 161 A.D.2d 11 [560 N.Y.S.2d 24] [replacing asbestos laden fireproofing material responsibility of lessor]; *Mayfair Merchandise Co.* v. *Wayne* (2d Cir. 1969) 415 F.2d 23, 25 [requirement to install sprinkler system was lessor's despite lessee's covenant to make "all necessary repairs"]; but see *First Nat. Stores* v. *Yellowstone Shop. Ctr.* (1968) 21 N.Y.2d 630 [290 N.Y.S.2d 721, 237 N.E.2d 868] [lessee had obligation to install city-ordered sprinkler system

based on character of building use despite lessor's covenant to make all repairs required by government order].)

Although as noted, we agree that the text of the compliance clause of the lease literally applies only to governmental laws, orders, et cetera, regulating the *uses* made of the property by the lessee, that conclusion alone is not dispositive. Several circumstances surrounding the transaction persuade us that the parties intended that the Green partnership accept responsibility for government-mandated work on the building *unrelated* to the particular use made of it by the lessees.

An interpretation of the lease which places the burden of complying with the abatement order on the lessor would, we think, lead to a strained and unrealistic result, given the unqualified duty of repair imposed by the lease on the lessees and the absence of any significant obligations on the part of the lessor. Moreover, viewed through the prism of the economics of the transaction, we think the case for concluding that the lessees assumed a virtually unqualified burden of compliance with government-ordered alterations, maintenance and repair of the property is stronger here than in *Sewell*, *supra*, 70 Cal.2d 666, itself. Financial considerations implicit in the text of the lease agreement make it clear that Brown negotiated a "net" lease, an arrangement that is not uncommon in long-term commercial leases, especially of entire buildings. ■ As one commentator on the characteristics of such leases has explained, "A net lease presumes the landlord will receive a fixed rent, without deduction for repairs, taxes, insurance, or any other charges, other than landlords' income taxes. Accordingly, the repair clause requires [the] tenant to make all repairs, inside and out, structural and otherwise, as well as all necessary replacements of the improvements on the premises (and to comply with all legal requirements affecting these improvements during the term). A lease is not 'net,' as this term is used in long-term leases, if the tenant's repair obligations are less than these." (1 Friedman on Leases (3d ed. 1990) Repairs, § 10.8, pp. 672-673, fn. omitted.) The economic exchange supporting such "net" leases has been succinctly described as one under which "the landlord foregoes the speculative advantages of ownership in return for the agreed net rental. The tenant, in turn, gambles on the continued value of the location and the improvement[s] . . . . and assumes all risks in connection therewith." (Van Doren, *Some Suggestions for the Drafting of Long Term Net and Percentage Leases* (1951) 51 Colum. L.Rev. 186.)

■ The fact that the form lease used by the parties here bears the word "net" at the foot of each page and that the heading of the addendum negotiated by the parties and annexed to the lease used the word "net," while

probative of the parties' intent, is not alone decisive. What is persuasive is a consideration of the provisions of the lease agreement as a whole, including its comparatively long 15-year term, the lessees' agreement to pay property taxes, to assume the risk of third party liability and to insure against that risk, the unqualified nature of the repair clause, the lessor's "negative" covenants with respect to *any* obligation to maintain or repair the property, and the elimination of any warranties on the part of the lessor.

It is, in short, reasonably clear *from the four corners of the agreement* itself that the parties intended to transfer from the lessor to the tenants the major burdens of ownership of real property over the life of the lease. Substantial and recent authority from other jurisdictions supports that conclusion. (See *Washington Univ.* v. *Royal Crown Bottling* (Mo.Ct.App. 1990) 801 S.W.2d 458 [lessee was obligated to make all repairs, including "structural" repairs, under 25-year commercial lease where lessee controlled entire building, paid lump-sum rental fixed for entire term, obtained and paid for casualty and liability insurance, and lease included clear language that parties intended to create a net lease]; *Fisher Properties* v. *Arden-Mayfair, Inc.* (1986) 106 Wn.2d 826 [726 P.2d 8, 16] [lease of commercial property for 25 years with additional extensions, was a "long-term triple net lease" under which "the tenant has a virtually complete obligation to repair . . ."]; *Chicago City Bank & Trust* v. *Ceres Terminals* (1981) 93 Ill.App.3d 623 [49 Ill.Dec. 180, 417 N.E.2d 798, 805] ["A net lease generally puts the burdens of ownership on the lessee, who pays all taxes and operating expenses on the property so that the landowner receives a fixed or 'net' rental."]; cf. *Ell and L. Investment Co.* v. *International Trust Co.* (1955) 132 Colo. 137 [286 P.2d 338, 339] [20-year lease of entire building; lessor to receive "a net annual rental" and all other expenses "of every nature whatsoever" to be borne by lessee; held: lessee responsible for cost of major structural repairs to save building from condemnation]; *Rietsch* v. *T.W.H. Co., Inc.* (Mo.Ct.App. 1985) 702 S.W.2d 108, 114 [702 S.W.2d 108]; *Capitol Funds, Inc.* v. *Arlen Realty, Inc.* (11th Cir. 1985) 755 F.2d. 1544, 1548-49.)

## B

■ Lessees and supporting amicus curiae press us to adopt a rule that the obligation to remove environmentally hazardous materials *always* falls on the lessor of commercial property *unless* the responsibility for their removal is *explicitly* allocated to the lessee by the text of the lease agreement. They argue that factors similar to those we enumerated in *Sewell, supra,* 70 Cal.2d 666, 674, footnote 10, compel such a result. We are not persuaded of the wisdom of adopting a bright-line rule of the kind sought by lessees. Apart from the relative novelty of environmental cleanup demands, there is little to

distinguish requiring a lessee to abate asbestos laden building materials and to replace, say, the entire roof of a large warehouse-like building of the sort involved in this case. We agree, however, that, given the differences between the use at issue here and the one in *Sewell, supra,* 70 Cal.2d 666, it is appropriate to apply the factors enumerated in *Sewell, supra,* at page 674, footnote 10 as "offer[ing] insight into the probable intent of the parties . . . ." (*Ibid.*)

Whether the parties actually intended the allocation of responsibilities suggested by the use of unqualified language in a lease is an inquiry better approached through the application of a handful of relevant factors than by a "four corners" analysis of the text that focuses exclusively on the interlocking provisions of the agreement itself and their legal consequences. Such an inquiry seems all the more appropriate in cases such a this one, involving the use of a so-called "form" lease, where the logic of preprinted terms may favor the interests of one party over that of the other and, even where interlineated by the parties, produce an unreasonable result. Although, as we noted in *Sewell, supra,* 70 Cal.2d at page 674, the factors are typically applied in deciding whether a compliance or repair obligation "require[s] curative actions of a 'substantial' nature," they are also highly relevant to the resolution of the cognate question as to which of the parties to a commercial lease has assumed the burden of complying with laws requiring the removal and disposal of hazardous building materials.

More significantly, in seeking the intent of the parties, courts can seldom safely rely solely on the text of the lease. As the New York high court has written, judges have long sought the intention of the parties, "*not as much from the letter of the lease as from a reasonable construction of their agreement,* having in mind the rent payable, the terms of the lease, the nature of the construction required, the relative benefit thereof to the respective parties, and what the parties had in contemplation when they executed this agreement." (*Cohen* v. *E. & J. Bass* (1927) 246 N.Y. 270 [158 N.E. 618, 620], italics added.)

We recognized explicitly in *Sewell, supra,* 70 Cal.2d 666, that in assessing the terms and the circumstances surrounding a nonresidential lease transaction, courts usually apply a handful of factors as "clues" or indicators as to whether the parties agreed that the lessee "assumed certain risks, despite the use of unqualified language." (*Id.* at p. 674, fn. 10.) That proposition has long been bedrock law. (See, e.g., *Baca* v. *Walgreen Co.* (1981) 6 Kan.App.2d 505 [630 P.2d 1185], affd. 230 Kan. 443 [638 P.2d 898], cert. den., 459 U.S. 859 [74 L.Ed.2d 112, 103 S.Ct. 130] (1982); *Gaddis* v. *Consolidated Freightways, Inc.* (1965) 239 Ore. 553 [398 P.2d

749]; *SKD Enterprises Inc.* v. *L & M Offset Inc.* (1971) 65 Misc.2d 612 [318 N.Y.S.2d 539]; *Mayfair Merchandise Co.* v. *Wayne, supra,* 415 F.2d 23; *Mid-Continent Life Insurance Co.* v. *Henry's, Inc.* (1974) 214 Kan. 350 [520 P.2d 1319]; *Iverson* v. *Spang Industries, Inc.* (1975) 45 Cal.App.3d 303, 310 [119 Cal.Rptr. 399] [". . . covenants [to repair] are generally reasonably interpreted to avoid placing any unwarranted burden of improvement on the lessee."]; Annot., Extent of Lessee's Obligation Under Express Covenant as to Repairs (1951) 20 A.L.R.2d 1331; 1 American Law of Property (Casner ed. 1952) Landlord and Tenant, § 3.80, p. 353.)[6]

▮▮▮▮ We examine the six factors as they apply to the record in this case.

(1) *The relationship of the cost of the curative action to the rent reserved.*

Not surprisingly, lessees seize on the absolute cost of the asbestos disposal operation—set at $251,856 in the judgment entered by the trial court—as confirming that the costs at issue here qualify as "substantial." The inquiry, however, is not quite so straightforward. Lessor points out that the roughly quarter million dollars estimated as necessary to finance asbestos-related disposal is less than 5 percent of the total rent reserved over the 15-year life of the lease, an expression of the value of the repair that throws a different light on the relative financial magnitude (and hardship) of the undertaking.[7]

As Friedman observes, "The language of a tenant's repair clause does not fully determine its construction. . . . [¶] Even a clause that states that the

---

[6]Lessees rely on two comparatively recent scholarly treatments of legal liability for asbestos abatement in the nonresidential lease context, treatments purporting to distill from the case law five criteria for allocating liability for complying with a government-ordered cleanup. (See Glazerman, *Asbestos in Commercial Buildings: Obligations and Responsibilities of Landlords and Tenants* (1987) 22 ABA Real Prop., Prob. & Trust J. 661 (Glazerman); Jensen, *Lessor and Lessee Liability Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA): The Catch-22 of Lease Agreements* (1991) 32 S.Tex. L.Rev. 447.) They urge us to apply those criteria in this case.

Even though it is true that *Sewell, supra,* 70 Cal.2d 666, was decided in an era in which the public was only dimly aware of the spectrum of potential environmental hazards, the multifactor approach noted in *Sewell, supra,* page 674, footnote 10, has been sanctioned by long use. Indeed, more recent formulations of the factors are closely similar to those enumerated in *Sewell.* (See, e.g., Glazerman, *supra,* 22 ABA Real Prop., Prob. & Trust J. at p. 666.) Given that similarity, we think the better approach is to continue to employ the factors enumerated in our *Sewell* opinion, interpreted in light of the intervening expansion of the public understanding of environmental hazards, the cost of their removal and disposition, and the likely effect of their possible presence on the intentions of the parties to a lease.

[7]That figure is derived by multiplying the monthly rental ($28,500) by the life of the lease (15 × 12 = 180 months) to yield total rental payment of $5,130,000, and dividing the cost of abatement ($251,856) by that figure, yielding 4.9 percent.

tenant is to make structural repairs has been deemed insufficient to require structural repairs by a tenant. In these cases the terms of the leases have been relatively short and the cost of the repair or change in question would have been as great, or nearly so, as the tenant's aggregate rent during the term. In this situation, there is a virtual refusal of [the] courts to construe this language literally. *Where the term is longer, and the tenant has time to amortize the cost, a repair clause is more apt to be construed literally.*" (1 Friedman on Leases, *supra*, Repairs, § 10.601, at pp. 655-656, fns. omitted, italics added; cf. *Washington Univ.* v. *Royal Crown Bottling,* 801 S.W.2d at p. 465.)

The relationship between the cost of compliance and the aggregate rent payable over the life of the lease is thus a significant factor in divining the probable intent of the parties and determining which of them agreed to bear the burden of compliance. In many—perhaps most—cases, it is likely that the cost of the mandated work, expressed as a percentage of the aggregate rent over the life of the lease, will tip in favor of the lessee. It is, after all, highly unlikely that a lessee would intend or expect to assume a repair/compliance burden that is, say, equal to or even a substantial fraction of the total rent over the life of the lease. The analysis is different, however, where, as in this case, the hazardous condition is discovered relatively early in a long-term lease, the total rent reserved over the life of the lease is a very high multiple (here, 20 times) of the cost of disposal, and the provisions of the lease agreement otherwise suggest that the parties intended that the lessees assume the major burdens of ownership.

(2) *The term for which the lease was made.*

There is little question under this rubric that a lease for a term of 15 years is a comparatively lengthy one. Although the inquiry is irreducibly relative, a lease of 15 years is closer to the "long-term" 25-year leases construed by the courts in *Washington Univ.* v. *Royal Crown Bottling, supra,* 801 S.W.2d 458, and *Fisher Properties* v. *Arden-Mayfair, Inc., supra,* 726 P.2d 8, 16, for example, than to the typical short-term lease of 3 or even 5 years. We need not, of course, decide forevermore whether a 15-year lease is "long-term" or not; under the circumstances of this case—involving the lease of an entire building and the transfer of substantial ownership obligations to the lessees—we decide only that a term of 15 years qualifies as "long."

The length of the lease term has significance for the determination of responsibility for government-ordered alterations for the reasons mentioned in the analysis of factor (1), above. Where the term of the lease is short, it is

highly unlikely that the lessee would have expected to assume responsibility for the cost of alterations that are, in effect, capital improvements to the property that will benefit primarily the owner. Conversely, where the lease term is a comparatively long one, the lessee has more time in which to amortize the cost of the alterations and stands more in the shoes of the building owner.

(3) *The relationship of the benefit to the lessee to that of the reversioner.*

No evidence was introduced at trial bearing on the projected useful life of the building. It is thus impossible to say on the basis of the record to what extent disposal of the asbestos laden material would benefit the lessor. Lessees argue that the benefits would be substantial, noting that, at the end of their term, the lessor would be in a position to market an "asbestos free" building, thus gaining a commercial advantage. Although that scenario seems a plausible one, it is also true that given the long-term nature of this 15-year lease and the fact that the hazardous material was discovered in only the third year of the term, the cleanup would be of substantial benefit to the lessees themselves. On balance, then, given this record, the benefit of the mandated work will inure to *both* parties.

(4) *Whether the curative action is structural or nonstructural in nature.*

Lessees point out that the removal and disposition of asbestos-containing fireproofing material is costly and expensive, requiring special equipment for containment of the material, warning signs, area evacuation and "moon-suited" workers. Moreover, because the removal here requires that the fireproofing material adhering to the building's structural beams be stripped, the work is literally "structural." That is true, of course, and under ordinary principles of construction might place the burden of cleanup on the lessor. (Cf. *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409, 432 [218 P.2d 17] [notwithstanding lease provision requiring the lessee to comply with all legal requirements, installation of building fire escapes was responsibility of lessor "because they are of a permanent nature and substantially benefit [the lessor's] reversionary interest"]; compare *Strecker* v. *Barnard* (1952) 109 Cal.App.2d 149, 153 [240 P.2d 345] [lease provision requiring lessee to " 'comply with all [laws] pertaining to said premises' " required lessee to make repairs to *existing* elevator ordered by county] with *Browning* v. *Aymard* (1964) 224 Cal.App.2d 277, 280 [36 Cal.Rptr. 604] [under identical compliance provision of lease, responsibility to *install* a fire alarm system was lessor's]; see 6 Miller & Starr, Cal. Real Estate (2d ed. 1989) Landlord & Tenant, § 18.106, p. 278.)

In the context of this case, however, the argument overlooks the fact that the lease agreement shifts, explicitly and systematically, responsibility for *all* repairs—expressly including "structural" repairs—to the tenants both by an affirmative provision (par. 7.1) and by expressly absolving the lessor of any responsibility for repairs, whether or not "structural" (par. 9), and that it does so in an overall context supporting the conclusion that the parties intended the lessees to assume the burdens of compliance and repair. The language of the lease is thus sufficiently definite and clear to negate the argument that "structural" alterations are not within the lessees' obligations. (Cf. *Fisher Properties* v. *Arden-Mayfair, Inc. supra,* 726 P.2d 8, 16 [lease covenant to "make . . . all repairs of all kinds, both inside and outside" properly interpreted in context of net lease to require lessee "to perform whatever repairs and maintenance were necessary to keep the premises in good repair . . . ."].)

(5) *The degree to which the lessee's enjoyment of the premises will be interfered with while the curative action is being undertaken.*

Our review of the case law suggests that if the lessee's use of the premises is substantially interfered with by the work required to comply with a given law or government order, that fact supports an inference that the lessor accepted the burden of compliance. (See, e.g., *Gaddis* v. *Consolidated Freightways, Inc., supra,* 398 P.2d at p. 752.) That supposition is consistent, we think, with the notion that the greater the magnitude (and the likely disruptive effect) of the compliance effort, the more likely it is to qualify as "substantial" and thus as part of the lessor's duty. Here, although the factual record is scanty on the point, it appears that the lessees were able to "work around" the flaking debris through the expediency of moving the retail sales operation into the former storage area and storing inventory in the area subject to delamination. The record is devoid of evidence as to whether this arrangement could be continued throughout the course of the actual abatement work, however. On balance, the most that can be concluded in light of the evidence is that the degree of interference is not so great as to weigh heavily in favor of a finding that the lessor accepted the compliance responsibility.

(6) *The likelihood that the parties contemplated the application of the particular law or order involved.*

In light of the finding of the trial court and the evidence supporting it, we can only conclude that although neither party was *aware* of or had reason to believe hazardous materials were present within the building at the time the lease agreement was negotiated and signed, both had notice of the *possibility*

that such a condition *might* exist, at least in the abstract. We think this fact is especially telling in a context in which lessees with substantial experience in retail leasing conceded that they had read and understood the notice at the foot of the lease proposal and elected not to pursue an investigation of that contingency. Although this factor is not dispositive of the question of responsibility for complying with the county-ordered abatement work, it is of considerable weight in leading us to conclude that the parties intended that the lessees would assume the burden of compliance with the abatement order. (We note, of course, the obvious fact that a finding of no abatement liability on the part of the lessee is likely where the condition at issue was unforeseeable or would not have been disclosed by a reasonable inspection of the site.)

C

An evaluation of the lease terms in light of factors substantially similar to those proposed by the lessees themselves leads us to conclude that the Court of Appeal was correct in ruling that the lessees assumed responsibility for removing the asbestos laden material from the building. That conclusion, we point out, does not necessarily follow in the typical *short-term* commercial lease. As several commentators have noted—and as our opinion in *Hadian* v. *Schwartz, supra,* 8 Cal.4th 836, also filed today, confirms—application of the factors identified above will in many, perhaps even most, cases place the burden of compliance on the property owner, both because the cleanup substantially enhances the lessor's reversionary rather than the lessee's possessory interest, and because the cost of compliance may be a substantial percentage of the entire rent reserved over the life of the term. (See, e.g., *Washington Univ.* v. *Royal Crown Bottling,* 801 S.W.2d at p. 465 [". . . there is no general rule which applies to the circumstances found in short-term leases. . . . [W]here the lease is for a short-term and the costs of repair are more than the aggregate rent over the term, courts are reluctant to construe 'repair' to include major structural repairs."]; see also, Stern & Tubbs, *Hazardous Substance Issues in Commercial Leasing* (1988) 13 ALI-ABA Course Materials J. 7; Glazerman, *supra,* 22 ABA Real Prop., Prob. & Trust J. at p. 691; 2 Friedman on Leases, *supra,* Compliance with Laws, § 11.1, pp. 700-701.) That conclusion, however, remains a mixed question of fact and law arising out of the provisions of *a particular agreement and its terms* and the context in which it arises, considered in light of established common law factors and the principle of reasonable construction, rather than one dependent on a bright line, a priori allocation of risk.[8]

---

[8]Lessees fail to persuade us that a developing body of national case law has uniformly placed the burden of asbestos abatement in nonresidential properties on lessors. They rely on

## CONCLUSION

The judgment of the Court of Appeal is affirmed.[9]

Lucas, C. J., Mosk, J., Kennard, J., Baxter, J., George, J., and Werdegar, J., concurred.

Appellants' petition for a rehearing was denied February 16, 1995.

two decisions of New York's intermediate appellate court (*Wolf* v. *2539 Realty Associates, supra*, 560 N.Y.S.2d 24; *Linden Boulevard, L.P.* v. *Elota Realty* (1993) 196 A.D.2d 808 [601 N.Y.S.2d 949]) and a decision of the Georgia Court of Appeal (*Sun Ins. Services* v. *260 Peachtree St.* (1989) 192 Ga.App. 482 [385 S.E.2d 127]). In none of these cases, however, is the rationale for the court's decision the per se presence of asbestos-containing materials in the leased building. Rather, the courts in all three cases interpreted the lease provisions at issue in light of *Sewell*-like factors before concluding that the landlord had agreed to assume the burden of alterations requiring the removal of asbestos in order to comply with abatement orders. The fact that in each case the cost of abatement was allocated to the landlord only confirms the supposition that application of the six factors will, in most cases, point to the lessor as the party assuming the burden; it does not, however, support an extrapolation of liability untethered to the text and the circumstances of the lease transaction. In short, we find the rationale of these decisions supportive of, rather than in conflict with, our own analysis.

[9]Having concluded that lessees assumed responsibility for complying with the county's abatement order, their dependent claim that the lessor's failure to remedy the asbestos condition amounted to a partial constructive eviction, entitling them to cease paying rent on the property while continuing to occupy it, falls of its own weight. (Cf. *Petroleum Collections, Inc.* v. *Swords* (1975) 48 Cal.App.3d 841 [122 Cal.Rptr. 114].)