*732
 
 Opinion
 

 SILLS, P. J.
 

 SW-846 is not the name of some new gasoline additive marketed by an oil company. It is the title of a manual compiled by the United States Environmental Protection Agency (EPA) dealing with the collection and testing of hazardous waste. The former plant manager of an Anaheim paint manufacturing company, Marion Hale, was convicted under state law of five counts of putting hazardous waste mixed with sawdust into a dumpster, the contents of which were destined for a landfill not authorized to accept hazardous waste. The proof of four of those counts involved evidence based on test samples, the gathering of which did not conform with certain procedures prescribed by SW-846. As we shall now explain, the evidence was properly admitted. California’s hazardous waste control law does not require rigid adherence to the EPA manual, and the deviation from the manual’s procedures in this case was substantively harmless.
 

 I
 

 In the mid-1980’s, Hale rose to be the plant manager of W.C. Richards Company, a paint manufacturer. By the late 1980’s, the smell emanating from the waste put into the company’s trash bins was so bad that the trash truck driver would get “high” after making a pickup when he entered the truck to clean it at the completion of his route. Occasionally, paint would spill out of the trash bins onto the dump truck. The driver noted that once the trash was pressed inside the truck, a wet paint-smelling liquid would leak out of the truck.
 

 On April 3, 1990, an anonymous phone call tipped off the Anaheim Fire Department about the waste disposal practices at the company. Within eight days, on April 11, 1990, a fire marshal arranged for the company’s trash to be collected in a clean and empty truck. After the collection, the fire marshall smelled a strong solvent odor and called the Orange County Health Department.
 

 A hazardous waste specialist and his assistant arrived, and “suited up” to collect the waste from the truck. The specialist used a “pile core sampler,” free of other contaminants, to obtain a sample. He took a duplicate sample for the company to test. He placed the sample in a freezer and later delivered it to a lab to be tested for chlorinated hydrocarbons, volatile compounds and heavy metals.
 

 The next day, April 12, the fire marshal and an assistant staked out the paint firm in a parked van equipped with a periscope about 30 feet away
 
 *733
 
 from the northeast section of the plant. The fire marshal saw two men mixing a semisolid gelatinous material with sawdust in a bin. She also saw them pour a liquid type material from several 55-gallon steel drums into the bin. Hale appeared several times during the morning to supervise the process; at one point the fire marshal was overcome by the smell of solvent. Around 9:30 a.m. the contents of the bin were shoveled into a nearby dumpster.
 

 The fire marshall then arranged for the trash company to pick up the dumpster with another empty truck. After the pickup and the return of the truck, the county hazardous waste specialist collected the waste in the same manner as the previous day.
 

 The fire marshal returned on April 16, again observed the mixing of solvent and sawdust, and again had the trash disposal company pick up the waste with an empty truck. The county hazardous waste specialist collected this day’s samples very quickly because of the confined space, limited air, and the uncertainty of the substances involved.
 

 The county specialist obtained a search warrant and went directly to the paint firm the next day, April 17. Hale was on vacation at the time. The county specialist went to the mixing bin, but in the process of collecting the first sample got some sludge on his glove. He wiped off the sludge, and, after he could no longer observe any residue, collected a sample of the waste in the same manner he had done on the previous days. He gave a split sample to a company purchasing agent in case the company wanted to do its own test.
 

 On April 25, the county specialist delivered the samples taken on April 12, 16, and 17 to West Coast Analytical Services for testing. Tests conducted in early May showed various volatile organics and heavy metals, including concentrations of 1,1,1 trichloroethane in each sample, ranging from at least 23,000 parts per million (milligrams per kilogram) to as much as 160,000 parts per million.
 

 On May 25, 1991, the Orange County District Attorney filed a five-count information against Hale, one count for each day of illegal disposal of hazardous waste on April 11, 12, 16 and 17, and a fifth count for disposal between January 1, 1988, through April 10, 1990. Each of the counts charged Hale with “knowingly disposing] and causing] the disposal of an hazardous waste at a point which is not authorized for such disposal,” in violation of section 25189.5, subdivision (b) of the Health and Safety Code. The jury eventually found Hale guilty as charged. Hale was sentenced to
 
 *734
 
 three years in prison, and a $5,000 fine for each count, plus a $1,000 restitution fine.
 
 [1]
 
 This appeal focuses on the evidence used to support the first four counts, and in particular these deviations from procedures prescribed by SW-846:
 

 (1) The county hazardous waste specialist neglected to write a sampling plan.
 

 (2) When the waste specialist got some of the glop on his glove on April 17, he only wiped it off with a paper towel. Also, he did not clean the sampler between samples that day.
 

 (3) The samples were tested more than 14 days after they were collected.
 

 (4) The samples were stored at freezing, instead of just a little higher than freezing.
 

 (5) The lab used SW-846 test method 8015, which is typically used for nonhalogenated organic material, rather than test method 8010 or 8240.
 

 II
 

 We first address Hale’s point that because the scientist has blundered the toxic dumper must necessarily go free.
 
 [2]
 
 We discern no per se rule which automatically precludes the introduction of evidence of disposal of hazardous waste just because the gathering of the sample does not follow every jot and tittle of the EPA manual.
 

 Hales was convicted under section 25189.5, subdivision (b) of the Health and Safety Code,
 
 [3]
 
 which proscribes the knowing disposal of “hazardous waste.” Hazardous waste is defined in section 25117 as waste which poses a “substantial present or potential hazard to human health or environment.” when improperly disposed of. The statutory text thus does not define hazardous waste in terms of a test, but in terms of reality.
 

 The contrast with
 
 People
 
 v.
 
 Mobil Oil Corp.
 
 (1983) 143 Cal.App.3d 261 [192 Cal.Rptr. 155], relied on by Hale, is clear. In
 
 Mobil,
 
 an oil company was prosecuted for violating a regulation of the State Air Resources Board
 
 *735
 
 which prohibited selling “gasoline having a Reid Vapor Pressure greater than nine pounds per square inch as determined by ASTM [American Society for Testing and Materials] Method D323-58.”
 
 {Id.
 
 at p. 265, italics omitted.) The law itself was thus
 
 defined in terms of a specific test.
 
 “Gross errors” could be obtained if
 
 that specific test
 
 was not “followed carefully."
 
 {Ibid.)
 
 No wonder, then, that where the evidence showed the prosecution had deviated from that test and the trial court dismissed the case because of it, the judgment was affirmed. The law was itself defined in terms of Reid vapor pressure, an “arbitrarily contrived concept,” rather than “true vapor pressure.” (See
 
 id.
 
 at pp. 276.) Here, by contrast, the law is defined in terms of realities (“hazard to human health or environment”) rather than methodologies (“ASTM D323-58”).
 

 Coombs
 
 v.
 
 Pierce
 
 (1991) 1 Cal.App.4th 568 [2 Cal.Rptr.2d 249] similarly affords Hale no help. There the appellate court held that there was insufficient evidence at an administrative hearing to revoke a driver’s license based on a drunk driving arrest where the laboratory had no license to operate a particular breathalyzer machine (the G.C. Intoximeter MK II, model 3000). More substantively, none of the three important prerequisites for breathalyzer tests already established in the case law was present: there was no evidence the machine was in working order, no evidence of how the test was administered and no information even as to who the operator of the machine was, much less whether he or she was competent or qualified.
 
 {Id.
 
 at p. 580.) Significantly, the court indicated if the “foundational prerequisites”
 
 had
 
 been satisfied,
 
 either
 
 by proper licensure
 
 or
 
 by showing working order, proper administration, and competence to operate, the evidence would have been sufficient.
 
 {Ibid.)
 
 However, because it was the administrative agency, not the driver, who had the burden of proof, the evidence was insufficient in the absence of either set of evidence.
 
 {Id.
 
 at pp. 580-581.)
 

 It is true that at the time of Hale’s dumping the State Department of Health Services had promulgated title 22, California Code of Regulations, section 66694, which provided that “[s]ampling . . . shall be in accord with the sampling . . . methodology . . . specified in . . . SW-846 . . . .” But it does not follow that this regulation necessarily limited the statute, which makes no reference to any particular set of methodologies. The focus of the statute is the substance of whether hazardous waste was improperly disposed of, not whether the tests to determine whether a given quantity of waste is truly hazardous conformed to a manual put out by a federal agency. The appropriate inquiry is whether the evidence was reliable to show hazardous waste disposal apart from whatever deviations there were from SW-846. That necessarily involves a case-by-case examination of the nature of any
 
 *736
 
 deviations from the EPA manual and the impact those deviations might have had on whether hazardous waste was, indeed, improperly disposed of.
 
 [4]
 

 In making this examination, we first confront the most problematic of Hale’s points, namely that the county hazardous waste specialist who collected the samples did not have a written sampling plan. The point is problematic because the ability to duplicate empirical results is foundational to science. (See Ayala & Black,
 
 Science and the Courts
 
 (May-June 1993) American Scientist, p. 234 [“Because a scientific explanation must be subject to such [empirical] testing, it is always possible that it will be proven false. Indeed, many scientists consider falsifiability the most important characteristic separating science from other forms of knowledge.”].) By not having a written sampling plan, the county hazardous waste specialist made it impossible to precisely duplicate his work.
 

 The failure to follow a written sampling plan, however, was harmless. The absolute worst that could have come from the failure to write and then follow a sampling plan is that the specialist took unrepresentative samples. If the subsequent test results showed levels of 1,1,1 trichloroethane that were anywhere close to being harmless—near, say, the 2 parts per
 
 billion
 
 that, as of April 1989, the EPA considered safe in drinking water (see 40 C.F.R. § 141.32(e)(8) (1989))—the possible variance between the sample and the rest of what was dumped might make a difference. Here, however, the samples were practically “off the scale” in the terms of harmful concentrations of the solvent. The lowest sample was 23,000 parts per million—2.3 percent. The highest sample exceeded 15 percent.
 

 Two conclusions flow from these numbers. One, because the ratio between the 1,1,1 trichloroethane in samples and what is harmless was so large, the jury could draw the commonsense conclusion that even if the samples were unrepresentative, there was still plenty of 1,1,1 trichloroethane in the balance of the waste to constitute a health or environmental hazard if improperly disposed of.
 

 Two, even if we assume, for sake of argument, that the possibility that the samples were unrepresentative would not allow any conclusions to be drawn as to the remainder of the waste, the fact still remains that the
 
 samples themselves
 
 constituted toxic waste. Even if for some reason the county specialist managed to gather samples that contained the
 
 only
 
 1,1,1 trichloroethane in the dumpster, the fact remains that the material in the sample still
 
 *737
 
 had been dumped, and the concentrations of 1,1,1 trichloroethane in that sample easily exceeded toxic levels.
 

 Moreover, while much in science rests on concentrations and dosages, section 25189.5 does not. “Any” hazardous waste will do.
 
 [5]
 
 And on this point there is no question that 1,1,1 trichloroethane is hazardous. As a “spent halogenated solvent” it was on the EPA’s list of hazardous waste at the time of the dumping here (see 40 C.F.R. § 261.31 (1990)) and remains so as a “[discarded commercial chemical product” in the current EPA regulations (see 40 C.F.R. § 261.33(f) (1994)). The stuff is routinely described as hazardous or toxic in published case law. (E.g.,
 
 U.S.
 
 v.
 
 Greer
 
 (11th Cir. 1988) 850 F.2d 1447, 1450 [reversing district court’s order of acquittal of charge of dumping hazardous waste in violation of federal law after jury returned guilty verdicts based on defendant’s dumping 1,1,1 trichloroethane];
 
 Folino
 
 v.
 
 Hampden Color and Chemical Co.
 
 (D.Vt. 1993) 832 F.Supp. 757, 759 [“Hazardous chemicals present on the site included . . . 1-1-1 trichloroethane . . . .”];
 
 State of N.Y.
 
 v.
 
 United States
 
 (E.D.N.Y. 1985) 620 F.Supp. 374, 386 [no dispute that 1, 1, 1-trichloroethane was “hazardous substance” within the meaning of federal statutes and regulations].) It has been recognized as a cause of serious human health problems. (See
 
 Rockwell Intern.
 
 v.
 
 Turnbull
 
 (Colo.App. 1990) 802 P.2d 1182,1183 [affirming administrative law judge’s findings that worker’s degenerative dementia was caused by exposure to 1,1,1 trichloroethane].) Indeed, its toxicity as a component of DDT was casually noted over 44 years ago. (See
 
 Application of Bowden
 
 (C.C.P.A. 1950) 183 F.2d 115, 116 [“In the following discussion, 2, 2 bis (p-chlorophenyl) 1, 1, 1-trichloroethane, a toxic poison, will be identified as DDT.”].)
 

 Hale’s second point is the potential for cross-contamination when the county specialist got some residue on his gloves on April 17. The specialist also did not clean the pile core sampler between samples. This argument fails because all the “cross-contamination” was coming from material that was already in the dumpster anyway. The pile core sampler was clean and sterile when it was brought to the dumpster. The worst that might have happened is that some of the toxic material
 
 already
 
 put in the dumpster might have been rearranged. That does not detract from the fact that it was still put there, and, as discussed above, in concentrations so high that there was no doubt of its toxicity.
 

 The third point is the 14-day time lag between the taking of the samples and actual tests. This point fails because the only effect that particular
 
 *738
 
 deviation from SW-846 had was to
 
 understate
 
 the level of volatile organic materials. The time lag did not hurt Hale, it helped him. A county public health chemist testified that compounds tend to
 
 lose
 
 concentration levels with the passage of time.
 

 The fourth deviation from SW-846 was the storage of the samples at freezing (that is, freezing for water), rather than at four degrees Celsius. The point is unavailing because the public health chemist testified that volatile organic compounds have freezing points much colder than zero degrees Celsius. Hence the colder-than-optimum storage had no effect on the samples.
 

 Finally, Hale claims that the lab should have used SW-846 test method 8010 or 8240 rather than 8015. Again, there was no prejudice to Hale because the substance of the matter worked in his favor. The public health chemist testified that test 8010 is preferred because it is more sensitive to chlorinated hydrocarbons; 8015 is less sensitive, that is, it might not pick up low levels. If hydrocarbons
 
 do
 
 show up on the 8015 test, it means there is a substantial quantity of them.
 

 The deviations from SW-846 were, substantively speaking, harmless. The test results still validly showed the disposal of hazardous waste, particularly 1,1,1 trichloroethane and lead. The results of the tests and the toxicologist’s testimony about the effects of what was in the samples were therefore admissible.
 

 The judgment is affirmed.
 

 Sonenshine, J., and Crosby, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied January 5, 1995.
 

 [1]
 

 Hale was given the upper term of three years for each count, with the sentence on each count to be served concurrently.
 

 [2]
 

 Paraphrasing Justice Cardozo’s famous dictum in
 
 People
 
 v.
 
 Defore
 
 (1926) 242 N.Y. 13, 21 [150 N.E. 585, 587].
 

 [3]
 

 All further statutory references unless otherwise indicated are to the Health and Safety Code.
 

 [4]
 

 “Improper” disposal is not at issue in this appeal. There is no question that the dumpsters into which Hale directed the disposal of the sawdust-sludge mixtures were destined for a landfill not equipped to handle hazardous waste.
 

 [5]
 

 There is no argument in this case that only trace or de minimis amounts were involved, and so we do not reach the question of how little in the way of hazardous waste might be cognizable under the statute. That amount, however, is certainly thousands of times less for 1,1,1 trichloroethane than 23,000 parts per million.