Opinion
 

 SILLS, P. J.
 

 I
 

 This case centers on a toxic substance clause in a lease of land to an aerospace manufacturer. The former lessee, defendant Tolo Incorporated, manufactured fusion reactors, particle accelerator parts and radar antennas, among other things. Tolo occupied the property, which is just off the Costa Mesa Freeway, from the late 1960’s to the mid-1990’s. It began leasing the land from plaintiff SDC/Pullman Partners in 1985 after a sale-leaseback deal. The lease was renewed in July 1989. It is that lease
 
 [1]
 
 which contains the clause in question.
 

 Quite remarkably—for an aerospace manufacturer—the land in question is not the subject of any cleanup actions on the part of any government entities, local, state or federal. Unlike some of Tolo’s neighbors,
 
 [2]
 
 the property has suffered no groundwater pollution; levels of toxic and hazardous substances
 
 *41
 
 in the soil have not been high enough to trigger any cleanup order. Perhaps the most remarkable fact to emerge from the trial exhibits is that in one sampling of soil from five feet beneath a fenced drum storage area near one of the buildings, some tetrachloroethene (PCE) was indeed found—but at a level, 5 parts per billion, which is
 
 only slightly above that found in chocolate sauce,
 
 which is 3.6 parts per billion. In the same vein, another expert report dryly opined, in a risk assessment of the soils at the Tolo site, that if a person contacted and “ingest[ed]” soil from the property 350 days a year for 30 years the additional risk of cancer would be 0.007 in 1,000,000.
 
 [3]
 

 The case comes to us after the trial judge directed a verdict for defendant Tolo. The plaintiff and drafter of the toxic substance clause, SDC/Pullman Partners, appeals from the ensuing judgment, arguing that the toxic substance clause in the lease obligated Tolo to clean up
 
 all
 
 toxic and hazardous substances at the property, and therefore the presence of detectable amounts of various chemicals, particularly in the oakite processing area of the facility, precluded the directed verdict. According to SDC, it makes no difference that the amounts of toxic or hazardous substances have not warranted governmental legal action; Tolo must still spend whatever is necessary to clean up even the trace amounts that
 
 do
 
 exist, and is in breach of its lease if it hasn’t.
 

 We disagree. The toxic substance clause here must be examined in light of the circumstances under which it was made and in light of principles articulated by our Supreme Court in the analogous cases of
 
 Brown
 
 v.
 
 Green
 
 (1994) 8 Cal.4th 812 [35 Cal.Rptr.2d 598, 884 P.2d 55] and
 
 Hadian
 
 v.
 
 Schwartz
 
 (1994) 8 Cal.4th 836 [35 Cal.Rptr.2d 589, 884 P.2d 46]. When it is, it is clear that the mere presence of de minimis amounts of certain substances otherwise toxic in larger quantities does not trigger the clause’s cleanup obligation.
 

 II
 

 As this case is fundamentally a dispute over a clause in a lease, we begin our analysis with the text itself, which, as the
 
 Hadian
 
 court said, is “presumptively controlling.”
 
 (Hadian v. Schwartz, supra,
 
 8 Cal.4th at pp. 844-845.) The toxic substance clause itself is a block of text arranged into one densely worded paragraph of over four hundred words. Rather than set forth the entire text all at once, we will exegete the language sentence by sentence.
 

 The first sentence opens with the words, “except as provided below,” and then sets out a blanket prohibition on the presence of any toxic material on
 
 *42
 
 the property without prior written permission.
 
 [4]
 
 This thought is immediately followed by a requirement that if the tenant
 
 [5]
 
 wants to use toxic substances, it must comply with all applicable laws and, further, show evidence of such compliance “reasonably” acceptable to the landlord.
 
 [6]
 
 The next two sentences give the landlord the right to require a detailed explanation of the use of any toxic substances
 
 [7]
 
 as well as obtain any copies of documents turned over to any governmental authorities regulating the use of toxic substances.
 
 [8]
 
 Then follows a blanket and absolute prohibition on the storage of any toxic materials in an underground tank.
 
 [9]
 
 The sixth sentence requires that the tenant obtain approval from the local fire department for the use of any toxic substances and that there be a label on the exterior of the premises as to what chemicals or toxic substances are “located within the premises.”
 
 [10]
 

 The next sentence—one of the two mainly relied on by SDC here—states that if “any such wastes, substances or materials” are “found” on or under the property resulting from the tenant’s use, the tenant will spend all
 
 *43
 
 necessary sums to “cause the same to be cleaned up”; at the same time the landlord is to be absolutely not liable for those cleanup costs.
 
 [11]
 
 Then comes a requirement that the tenant be in “compliance” with all environmental laws, after which there is listed a compendium of environmental statutes.
 
 [12]
 

 The ninth sentence in the clause deals with the tenant’s duties in the event that the tenant receives notice of violation of any environmental laws, which duties include immediately curing the “deficiency or complained of matter” and giving the landlord proof of that curing.
 
 [13]
 
 Sentence No. 10 affords the landlord the “right but not the duty” to step in and cure—but at the tenant’s expense—any default or failure of performance by the tenant under the clause.
 
 [14]
 

 The penultimate sentence provides for the indemnification of the landlord by the tenant by reason of the tenant’s failure to perform its obligations
 
 *44
 
 under the clause.
 
 [15]
 
 Finally, the last sentence allows the landlord to enter the premises anytime, without notice, to ascertain whether the tenant is “in compliance” with the requirements of the paragraph.
 
 [16]
 

 In the 1994
 
 Brown
 
 and
 
 Hadian
 
 cases, our Supreme Court was confronted with the construction of certain lease clauses operationally similar to the toxic substance clause at issue here. Both cases involved “compliance with laws” clauses which regulated the tenant’s use of the property, and which, ostensibly, could be read to require that the tenant bear the cost of expensive capital improvements mandated by a governmental agency. In
 
 Brown
 
 the question involved asbestos cleanup; in
 
 Hadian
 
 it was earthquake retrofitting. In reaching different results for each case (in
 
 Brown,
 
 the tenant had to pay, in
 
 Hadian
 
 it was the landlord) the high court emphasized that not only must there be “a close consideration ... of the terms of the lease but of the circumstances surrounding its making.”
 
 (Brown
 
 v.
 
 Green, supra,
 
 8 Cal.4th at p. 825.) In particular, the nature of the tenant’s
 
 use
 
 of the property as contemplated by the parties is extremely important (see
 
 id.
 
 at pp. 821, 823, each time discussing
 
 Glenn R. Sewell Sheet Metal, Inc.
 
 v.
 
 Loverde
 
 (1969) 70 Cal.2d 666 [75 Cal.Rptr. 889, 451 P.2d 721]), as well as six judicially developed factors which serve as “clues” or indicators of the risks and burdens which the parties intended to establish. (See
 
 Brown, supra,
 
 8 Cal.4th at p. 829.)
 

 We need only note here that emphasis placed by the
 
 Brown
 
 and
 
 Hadian
 
 courts on the circumstances of the lease could hardly have been unexpected. Since as early as 1872 California statutory law has admonished judges that the circumstances under which a contract is made is necessary to its proper construction. (See Code Civ. Proc., § 1860; Civ. Code, § 1647.)
 

 In the present case, we affirm the trial court’s judgment because the terms and circumstances of the toxic substance clause, confirmed by the
 
 *45
 
 policy expressed in the judicially developed factors used in
 
 Brown
 
 and
 
 Hadian,
 
 all point to the conclusion that the toxic substance clause was intended to protect the landlord against
 
 actual
 
 liability—or at least the realistic threat of actual liability—from the tenant’s noncompliance with environmental law, not require the tenant to spend potentially enormous sums to extract trace and de minimis amounts of certain molecules to avoid purely speculative environmental liability.
 

 Ill
 

 If one thing is clear from the toxic substance clause here, particularly in light of the circumstances under which the lease was made, it is that the parties certainly intended that Tolo would be allowed to continue its normal, high-tech manufacturing operations, and would be allowed to use toxic materials incidental to those operations. Taken as a whole, the entire toxic substance clause here is devoted to
 
 conditioning
 
 and
 
 regulating
 
 Tolo’s use of “toxic” materials, not blanketly prohibiting their use. Most of the sentences in the clause revolve around the need for precautions to be taken and Tolo’s responsibilities if precautions are not. The only real ironclad prohibition is of toxic materials in underground storage tanks.
 

 If there is any doubt from the text, the circumstances of the lease are dispositive. At the time the lease was made Tolo was engaged, as it had been for about 20 years, in the manufacture of parts for the aerospace industry. There is no way that such parts can be made without using toxic materials; radar antennas and such things, if we may be forgiven for making the point facetiously, are not made of tofu and sprouts. The idea therefore, which permeates SDC’s brief, that in 1989 the parties were starting from ground zero and that Tolo was going to have to obtain written permission every time any toxic materials came onto Tolo’s plant after 1989, even if such materials were part of its normal manufacturing processes, is untenable. SDC reads the first sentence in a way which would have frustrated the purpose of the lease, forcing Tolo to go out of business altogether.
 

 SDC places great stress on the need for written permission, and asks what purpose could those words have if not to first establish a blanket prohibition on the use of toxic substances, subject to the written permission requirement. SDC argues that the lease could hardly have contemplated that (a) Tolo would have blanket permission to use toxic materials but (b) would have to obtain permission if it wanted to use them in such a way as to violate environmental law. One would be left with the proposition that the lease would have contemplated the use of toxics
 
 in violation of law
 
 if written permission had first been obtained.
 

 
 *46
 
 The argument, however, relies on a false dichotomy. The parties may have contemplated that Tolo should continue to do what it had been doing; they did not necessarily contemplate that Tolo could change its manufacturing operations and subject the landlord to a substantially increased risk of environmental liability without written permission. The company could not, for example, have converted its plant to the local equivalent of Lockheed’s famous “Skunkworks,” and manufactured, say, the (apparently very toxic) coating of stealth aircraft without first obtaining written permission. Even though such manufacturing per se might not
 
 necessarily
 
 violate any antipollution law, there certainly would be an increased risk of a spill on the property.
 

 That leaves sentence number seven, with its statement that if “any” toxic wastes, substances or materials are “found” on or under the property resulting from the tenant’s use, the tenant will spend all necessary sums to “cause the same to be cleaned up.” If read in literal isolation, that is, apart from the balance of the clause and the circumstances under which the lease was made, and if one interprets the word “any” in an extreme and absolutist way, one can indeed conclude that Tolo was required to spend untold sums of money to eliminate every last vestige of any toxic substance “found” anywhere on the property.
 

 But contract terms cannot be read in isolation. (Civ. Code, § 1641.) They must be read as a consistent whole, so that some effect will be given to all clauses, consistent with the general intent and purpose of the instrument. (Civ. Code, § 1652.) The words of a contract may be explained by reference to the circumstances under which the contract was made. (Civ. Code, § 1647.) In fact, literal language of a contract does not control if it leads to absurdity (Civ. Code, § 1638) or if it is wholly inconsistent with the main intention of the parties (Civ. Code, § 1653). And if these rules are not enough, the language of a contract should be “interpreted most strongly” against the party who caused the uncertainty to exist (Civ. Code, § 1654), in this case SDC, as it is undisputed its in-house counsel wrote the document. In light of these rules, there are three reasons we reject the absolutist reading of “any” in the seventh sentence proffered by SDC.
 

 First, such a reading is inconsistent with textual context. The balance of the toxic substance clause—important because the very first words of the opening line indicate that some use of toxics
 
 is
 
 being provided for— contradicts SDC’s proffered interpretation. As we have already indicated, most of the clause is predicated on the idea that Tolo
 
 would
 
 use toxic materials, but such use would have to be regulated to ensure that SDC incurred no legal liability under applicable environmental law because of
 
 *47
 
 that regulated use. Sentence after sentence points the reader to applicable environmental law, the implication being that it would serve as a benchmark.
 

 Second, an absolutist reading of the seventh sentence is unreasonable under the circumstances of
 
 this
 
 lease. This is not a residential lease. Tolo’s use of the property was already ongoing when SDC bought the property and became a landlord with a tenant already in place. SDC knew that Tolo was an aerospace manufacturer and could not conduct even the cleanest operations without some use of toxic substances.
 
 [17]
 
 Obviously, in such circumstances, Tolo had to be cut a little slack as far as the containment of those substances was concerned. “ ‘[S]afe,’ ” as the United States Supreme Court noted in
 
 Industrial Union Dept.
 
 v.
 
 American Petrol. Inst.
 
 (1980) 448 U.S. 607, 642 [100 S.Ct. 2844, 2864, 65 L.Ed.2d 1010], “is not the equivalent of ‘risk-free.’ ” The
 
 “nature
 
 of the lessee’s use of the property" (see
 
 Brown,
 
 v.
 
 Green, supra,
 
 8 Cal.4th at p. 823) meant that at least a few molecules on the list of hazardous substances might escape into the environment and on to the ground.
 

 Third, an absolutist reading of the seventh sentence is unreasonable from the standpoint of actual hazard or toxicity. The list of hazardous substances found in appendix A to section 302.4 of title 40 of the Code of Federal Regulations contains a number of common materials which are not “toxic” in de minimis or infinitesimal concentrations. The list contains zinc and chromium, for example, which one can obtain at health food or vitamin stores, and cadmium, which is contained in stainless steel cutlery. Nickel and silver are also listed, even though no one would ever think that collections of silver coins were “hazardous.” Another example is acetone. Acetone is formed in the human liver when fats are metabolically broken down (see Stryer, Biochemistry (Freeman and Company, 3d ed. 1988) pp. 478-479 [discussing formation of ketone bodies in the liver from acetyl coenzyme if fat breakdown predominates]), as, for example, in exercise. And, as this very record shows, another listed hazardous substance, tetrachloroethene, naturally occurs in chocolate.
 

 It would be ludicrous to hold that, say, a buried bag of silver coins constituted a “hazardous substance." Obviously, a rule of reason must be used in explicating what is hazardous. (See
 
 Industrial Union Dept.
 
 v.
 
 American Petrol. Inst., supra,
 
 448 U.S. 607 [affirming lower court refusal to enforce occupational safety and health standard requiring reduction of benzene in air from 10 parts per million to 1 part per million].) SDC, however,
 
 *48
 
 is unable to point to any health hazard.
 
 [18]
 
 Indeed, the evidence is quite the contrary: If you can eat the soil 350 days a year for 30 years and incur an increased cancer risk of only
 
 0.007 in 1,000,000
 
 you don’t really have “any” “toxic” substances in any sane or intelligent sense at all.
 

 IV
 

 In addition to basic contract interpretation rules, our conclusion is confirmed by reference to the six judicially developed factors actually used in the context of compliance with laws clauses as explicated in
 
 Brown
 
 and
 
 Hadian.
 
 Those six factors are: (1) the relationship of the cost of curative action to the rent reserved; (2) the term for which the lease was made; (3) the relationship of the benefit to the lessee to that of the reversioner; (4) whether the curative action is structural or nonstructural in nature; (5) the degree to which the lessee’s enjoyment of the premises will be interfered with while the curative action is being undertaken; and (6) the likelihood that the parties contemplated the application of the particular law or order involved.
 
 (Brown
 
 v.
 
 Green, supra,
 
 8 Cal.4th at pp. 830-833;
 
 Hadian
 
 v.
 
 Schwartz, supra,
 
 8 Cal.4th at pp. 847-849.)
 

 Preliminarily, of course, we should note that the six factors were not developed to explicate toxic substance clauses, and do not readily lend themselves to rote, mechanical application to such clauses. Even so, the factors are instructive because their
 
 very existence
 
 indicates a judicial policy to take a common sense, rather than absolutist, approach to contractual risk allocation between landlords and tenants.
 

 Thus, the first factor (cost of curative action as a proportion of total rent received) reveals that the law disfavors the allocation of curative burdens in a grossly disproportional way. Yet the elimination of pollution is subject to the law of diminishing returns. The cost of eliminating every last molecule otherwise toxic in larger quantities is necessarily prohibitive. (Cf.
 
 Industrial Union Dept.
 
 v.
 
 America Petrol Inst., supra,
 
 448 U.S. at p. 628 [100 S.Ct. at pp. 2856-2857] [discussing occupational benzene standard].)
 

 The Supreme Court illustrated the importance of disproportionality by self-consciously contrasting the results it reached in
 
 Brown
 
 and
 
 Hadian.
 
 Thus in
 
 Brown,
 
 the absolute cost of the curative action was high (about
 
 *49
 
 $250,000), but constituted less than 5 percent of the reserved rent. The costs were to be borne by the tenant. (See
 
 Brown
 
 v.
 
 Green, supra,
 
 8 Cal.4th at pp. 830-831.) In
 
 Hadian,
 
 by contrast, the cost of curative action was smaller ($23,400), but amounted to almost 145 percent of the cost of the entire rent reserved over the term of the lease.
 
 (Hadian
 
 v.
 
 Schwartz, supra,
 
 8 Cal.4th at p. 847.) The costs in that case were to be borne by the landlord.
 
 [19]
 

 The next four factors used in
 
 Brown
 
 and
 
 Hadian
 
 convey roughly the same idea: The shorter the term of the lease (2), the less likely it is that the parties contemplated the allocation of a relatively expensive burden on the tenant. The same idea courses through the relation between the benefit to the tenant and benefit to the landlord (3), the structural or nonstructural nature of the curative action (4), and degree of interference with the tenant’s enjoyment of the premises (5). The harsher the burden on the tenant in relation to what it receives from the lease, the less likely the parties intended that the curative action be visited on the tenant.
 

 The sixth
 
 Brown
 
 and
 
 Hadian
 
 factor—the contemplation of the specific application of the particular law—is especially relevant. If there is a drumbeat theme in this toxic substances clause here, it is reference to existing environmental laws and assurance of compliance with those laws. The enumerated environmental statutes were very much in the mind of the parties in entering into the lease agreement. Again, as we have noted above, the strong implication from the continual reference to compliance with applicable environmental statutes is that the actual application of such laws would serve as the trigger for the tenant’s cleanup duties.
 

 V
 

 We must now confront the problem of the energumenical lengths to which the definition of “hazardous substance” under the federal environmental law known as CERCLA
 
 [20]
 
 has been taken. It is true that as a matter of liability under CERCLA, some federal courts have held there is no “threshold concentration requirement.”
 
 (U.S.
 
 v.
 
 Alcan Aluminum Corp.
 
 (3d Cir.
 
 *50
 
 1992) 964 F.2d 252, 259; accord,
 
 Amoco Oil Co.
 
 v.
 
 Borden, Inc.
 
 (5th Cir. 1989) 889 F.2d 664, 669.) Unlike our approach above to the lease terms here, these federal courts
 
 have
 
 adopted an absolutist reading of what is “hazardous”: If the
 
 substance
 
 is found in one of the designated categories set forth in 42 United States Code section 9601(14), it is hazardous, without regard to quantity. (E.g.,
 
 Alcan Aluminum, supra,
 
 964 F.2d at p. 260.) Thus we must ask, as SDC would have us ask, if “hazardous substance” is read without regard to quantity under CERCLA, why should it not be read without regard to quantity in the lease term here?
 

 We are merely a state intermediate appellate court charged, in this appeal, with interpreting terms in a lease of real property under state contract law, and so the issue of how CERCLA should be interpreted is not before us. If federal courts have insisted on reading a federal law without any reference to reason or common sense, that is their business. However, our conclusion is not necessarily inconsistent with those federal decisions. There is a significant difference between liability in a CERCLA action and a private cleanup duty pursuant to a lease.
 

 U.S.
 
 v.
 
 Alcan Aluminum Corp., supra,
 
 964 F.2d 252 is instructive, because there the court had the intellectual honesty to confront the reductio ad absurdum inherent in an absolutist definition of hazardous substance. In
 
 Alcan Aluminum,
 
 an aluminum manufacturer used an emulsion in the processing of aluminum ingots which consisted of 95 percent water and 5 percent mineral oil. In the process, some small fragments of copper, chromium, cadmium, lead and zinc were absorbed into the emulsion. All of those substances qualify as “hazardous” under CERCLA. Interestingly enough, the levels of each metal in the emulsion were “orders of magnitude
 
 below ambient or naturally occurring background
 
 levels.”
 
 (U.S.
 
 v.
 
 Alcan Aluminum Corp., supra,
 
 964 F.2d at p. 256, italics added.) About 2,300,000 gallons of the emulsion were deposited in an old mine shaft, along with other hazardous wastes from other producers, by a licensed waste processor in the late 1970’s, but in 1985 some of the wastes in the mine shaft got into the Susquehanna River. The federal government sued 20 defendants, all contributors to the stuff in the mine shaft, for its costs of cleaning up the spill. All settled except for the aluminum company—after all, its waste contained
 
 less
 
 copper, chromium, cadmium, lead and zinc than
 
 clean dirt! (Id.
 
 at p. 259.) The federal district court, reasoning that quantity makes no difference under CERCLA, granted summary judgment to the government.
 

 The Third Circuit held that the trial court was correct on the definition of hazardous substance. (See
 
 U.S.
 
 v.
 
 Alcan Aluminum Corp., supra,
 
 964 F.2d at pp. 261-264.) But the court was not totally oblivious to the obvious implications of its position. The company had pointed out that “virtually
 
 *51
 
 everything in the universe would constitute a hazardous substance” under CERCLA without a minimal quantity requirement, including federally approved drinking water. (See
 
 id.
 
 at p. 260; see also
 
 id.
 
 at p. 267.) The court, to its credit, recognized that the point had “considerable strength.”
 
 (Id.
 
 at p. 267.)
 
 [21]
 

 The
 
 reason
 
 the
 
 Alcan Aluminum
 
 court then rejected the point about the absurdity of defining hazardous substances without regard to quantity was the possible
 
 cumulative effect
 
 of small amounts of waste to a larger whole by many contributors. Essentially, the court, perhaps not realizing it, borrowed the rationale of
 
 Wickard
 
 v.
 
 Filburn
 
 (1942) 317 U.S. 111, 125 [63 S.Ct. 82, 89, 87 L.Ed. 122], in which it was held that a small farmer’s individual wheat sales might not affect interstate commerce themselves, but the sales of many other similarly situated farmers would, and therefore the individual farmer’s sales could be regulated under the interstate commerce clause. In
 
 Alcan Aluminum,
 
 the court reasoned that an individual’s contribution of an emulsion might be insignificant by itself, but taken together with the contribution of other similarly situated individuals, could have a toxic effect. In declining to read a minimum concentration requirement into CERCLA, the
 
 Alcan Aluminum
 
 court was worried that CERCLA’s purposes would be thwarted if persons who contributed only de minimis amounts of substances otherwise toxic could not be held liable under CERCLA, because a site which
 
 did
 
 “ ‘warrant remediation’ ” might be composed of pollution from many small contributors, each of whom, individually, might be able to claim that its “ ‘particular contribution’ ” did
 
 not
 
 warrant remediation. (964 F.2d at pp. 267-268, quoting
 
 U.S.
 
 v.
 
 Western Processing Co.
 
 (W.D.Wash. 1990) 734 F.Supp. 930, 937.)
 

 We need not comment on the degree to which the
 
 Wickard
 
 v.
 
 Filburn
 
 rationale actually made sense in the context
 
 of the
 
 facts in
 
 Alcan Aluminum,
 
 because that rationale has no application beyond, as the
 
 Alcan Aluminum
 
 court itself put it, the “multi-generator context.” (964 F.2d at p. 267.) This is not a case where a court might think it necessary to torture common sense to avoid a result which would allow a small polluter to get off the hook completely. This is not a case where the land has been used as a dump as a result of the tiny contributions of many producers. It is, rather, a case where there is only one producer, and one parcel of land, and no necessity of cleanup.
 

 VI
 

 We now come, if we may be forgiven the pun, to the real nitty gritty of the case. SDC is clearly afraid of any potential liability under CERCLA, and argues that the lease clause in the present case should be read in an absolute
 
 *52
 
 manner so as to give effect to the lease’s evident purpose of protecting the landlord from potential CERCLA liability.
 

 SDC’s fear is not wholly unreasonable. If a landowner wants to read something really scary, he or she might want to consider this passage from
 
 Templeton Coal Co., Inc.
 
 v.
 
 Shalala
 
 (S.D.Ind. 1995) 882 F.Supp. 799, 824, footnote 13: “Under CERCLA, any release of materials defined as hazardous waste under the statute, no matter how small the release and no matter when it occurred, can result in joint and several liability for the entire cost of cleaning up the site where the release occurred. In other words, even the release of a
 
 de minimis
 
 amount of hazardous waste, done years before, can result in a party’s liability under CERCLA for millions of dollars in cleanup costs.”
 

 But while SDC’s fears are not wholly unfounded, they are answered by the difference between
 
 actual
 
 CERCLA liability and
 
 speculative
 
 CERCLA liability. Using an absolutist definition of hazardous substance, there probably isn’t a person in the United States—at least over age 10—who could not in theory be tagged for some sort of cleanup cost somewhere. Anyone who has ever painted anything, who ever put on or took off fingernail polish, who ever used an insecticide, drove a car, changed its oil or had oil changed, smoked a cigarette or changed the toner in a photocopy machine, or who has so much as thrown away a small battery into the trash, could be theoretically held liable for expensive cleanup costs. Yet to base an interpretation of a contract on such theoretical liability is self-evidently absurd. It would reify an unreasonable fear into an actuality.
 

 An analogous area of law is the federal doctrine of standing which denies litigants the ability to challenge as facially unconstitutional certain statutes when the application of those statutes
 
 to them
 
 is only speculative. One of the best known examples of that doctrine may be found in the famous Supreme Court case of
 
 Bowers
 
 v.
 
 Hardwick
 
 (1986) 478 U.S. 186 [106 S.Ct. 2841, 92 L.Ed.2d 140].
 

 Most law students are familiar with the
 
 Bowers
 
 decision, which upheld the legality of Georgia’s criminal antisodomy statute as against a challenge brought by a man who was, as the Supreme Court described him, “a practicing homosexual.”
 
 (Bowers
 
 v.
 
 Hardwick, supra,
 
 478 U.S. at p. 188 [106 S.Ct. at p. 2842].) What students sometimes forget, however, is that the case also involved, at the trial level, an anonymous married couple who themselves attacked the Georgia statute on the ground that
 
 they
 
 were “ ‘chilled and deterred’ ” by the very existence of the law. (See
 
 Hardwick
 
 v.
 
 Bowers
 
 (11th Cir. 1985) 760 F.2d 1202, 1204.) The federal district court,
 
 *53
 
 however, ruled that the married couple had no standing to challenge the constitutionality of the statute, a decision which was affirmed on appeal.
 

 What was dispositive for the appellate court in
 
 Hardwick
 
 was the lack of even an allegation that the married couple “faced a serious risk of prosecution.” They had filed nothing to show they faced any “realistic threat” of prosecution. Therefore they had no standing under
 
 Younger
 
 v.
 
 Harris
 
 (1971) 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669], a Supreme Court case which had held that a group of California professors had no standing to challenge a state “syndicalism” statute which, they claimed, inhibited their right to espouse socialism because their fears were “imaginary” and “speculative.” (See
 
 Hardwick
 
 v.
 
 Bowers, supra,
 
 760 F.2d at pp. 1206-1207 and
 
 Younger, supra,
 
 401 U.S. at p. 42 [91 S.Ct. at pp. 749-750].)
 

 In light of the circumstances under which the lease in the case before us was made and the clear contemplation of the parties that the property would continue to be used for aerospace manufacturing, we hold that only real CERCLA liability—or at least a “realistic threat” of it—can reasonably trigger a tenant’s cleanup duty. Anything else merely perpetuates phantasms.
 

 Of course, in the event that a government agency
 
 were
 
 to require SDC to spend sums to clean up the property, the indemnity clause would still be available to it to recover those sums from Tolo. Our decision here would certainly not be res judicata on the operation of the indemnity clause in the context of
 
 real
 
 CERCLA liability. Indeed, nothing in this opinion is meant to minimize SDC’s right to recover costs from Tolo in such an eventuality.
 

 VII
 

 The trial judge’s reading of the toxic substance clause was thus correct, and the directed verdict based on that reading was therefore correct as well. Since SDC could not show a breach of the lease, the balance of its causes of action which are predicated on the idea that Tolo polluted the property must fall as well.
 

 The lease was an integrated agreement and thus parol evidence was not available to add to or otherwise vary its terms.
 
 (Masterson
 
 v.
 
 Sine
 
 (1968) 68 Cal.2d 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561].) It would have been error for the court to have admitted evidence of negotiations prior to the signing of the agreement. (E.g.,
 
 Weisenburg
 
 v.
 
 Thomas
 
 (1970) 9 Cal.App.3d 961, 965 [89 Cal.Rptr. 113].)
 

 Nor was there any need for parol evidence to explicate an ambiguity in the agreement. As shown above, the text of the agreement was not reasonably
 
 *54
 
 susceptible to SDC’s interpretation. Accordingly, it was not error for the trial judge to have excluded the testimony of James C. Watson, an SDC principal, as to what the parties really meant by the clause.
 

 It was also not error to exclude the testimony of SDC’s environmental expert, Anthony F. Severini, to the effect that the three lost buyers were reasonable in not proceeding to buy the property. What we have already said about the difference between speculative and real CERCLA liability addresses that concern. Yes, the buyers may have acted reasonably in being scared away from buying the property. No, that fact was not relevant.
 

 Our determination on the point obviates any need to consider Tolo’s cross-appeal, which is based on the idea that Tolo’s president, defendant James Lockshaw, was entitled to a judgment of nonsuit after SDC’s opening statement.
 

 The judgment is affirmed.
 

 Sonenshine, J., and Rylaarsdam, J., concurred.
 

 A petition for a rehearing was denied January 13, 1998.
 

 [1]
 

 Actually, there are three identical lease for three contiguous parcels of property.
 

 [2]
 

 For example, ACL Technologies, Inc., which had a leaky underground storage tank problem, is down the road. (See
 
 ACL Technologies, Inc.
 
 v.
 
 Northbrook Property & Casualty Ins. Co.
 
 (1993) 17 Cal.App.4th 1773 [22 Cal.Rptr.2d 206].)
 

 [3]
 

 Though someone who ate the dirt at even the cleanest aerospace plant 350 days a year would probably get sick of something other than cancer long before 30 years passed.
 

 [4]
 

 Here is the text:
 

 “56. Toxic or Hazardous Substances. Except as provided below, Lessee shall not use, store or permit toxic waste or other toxic or hazardous substances or materials on the Premises during the term of this Lease, without prior written notice to Lessor.”
 

 [5]
 

 “Lessor” and “lessee” would be a little more exact than “landlord” and “tenant,” but not as readily understandable. As with “insurer” and “insured,” when there are only a few letters which differentiate key terms, it is generally better to use easily differentiated synonyms, e.g., “insurance company” and “policyholder.” Our use of “tenant” is generic.
 

 [6]
 

 Here is the text:
 

 “In the event, Lessee desires to use or store toxic or hazardous substances on the Premises (including but not limited to petroleum based fuels), Lessee shall comply with all applicable laws, and shall provide evidence of such compliance reasonably acceptable to Lessor. At the written request of Lessor, Lessee shall provide a detailed explanation (in writing) of the types of chemicals/substances which Lessee uses, the location and manner of storage of same, and the manner of disposition of such chemicals/substances or by-products or remains thereof.”
 

 [7]
 

 Here is the text:
 

 “At the written request of Lessor, Lessee shall provide a detailed explanation (in writing) of the types of chemicals/substances which Lessee uses, the location and manner of storage of same, and the manner of disposition of such chemicals/substances or by-products or remains thereof.”
 

 [8]
 

 Here is the text:
 

 “Lessee shall deliver to Lessor at Lessor’s written request, copies of all studies, reports and other information submitted by Lessee to any governmental entity or agency regulating the use of such substances and materials.”
 

 [9]
 

 Here is the text:
 

 “In no event shall Lessee store any chemicals/substances in underground tanks.” Tolo did have an underground tank on the premises
 
 prior
 
 to the 1989 lease, but it is undisputed that the tank was not
 
 used
 
 after the lease. The tank has since been dug up and found not to have leaked.
 

 [10]
 

 Here is the text:
 

 “The use of such chemicals/substances shall be approved, if necessary, by the local fire department and the exterior of the Premises shall clearly set forth a label as to the chemicals/ substances located within the Premises.”
 

 [11]
 

 Here is the text:
 

 “In the event that any such wastes, substances or materials are hereafter found on, under or about the Premises and such are a result of Lessee’s occupancy and/or use of the demised premises, whether during the term of this Lease or any prior occupancy except as expressly allowed under this Lease, or by Lessor, then Lessee shall take all necessary and appropriate actions and shall spend all necessary sums to cause the same to be cleaned up and immediately removed from the Premises, and Lessor shall in no event be liable or responsible for any costs or expenses incurred in so doing.”
 

 [12]
 

 Here is the text:
 

 “Lessee shall at all times observe and satisfy the requirements of, and maintain the Premises in compliance with, all federal, state and local environmental protection, occupational, health and safety and similar laws, ordinances, restrictions, licenses and regulations, including but not limited to, the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), Safe Drinking Water Act (42 U.S.C. Section 3000(f) [sic] et seq.), Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), Clean Air Act (42 U.S.C. Section 7401 et seq.), Comprehensive Environmental Response of Compensation and Liability Act [sic] (42 U.S.C. Section 9601 et seq.), California Health and Safety Code (Section 25100 et seq., Section 39000 et seq.), California Water Code (Section 13000 et seq.).”
 

 [13]
 

 Here is the text:
 

 “Should Lessee at any time receive any notice of violation of any laws, including those aforementioned, or be given a citation with respect thereto, Lessee shall (i) immediately notify Lessor of such violation or citation, (ii) provide Lessor with a copy of same, (iii) immediately begin to diligently cure the deficiency and continuously pursue such cure to completion and (iv) immediately provide Lessor with proof of the curing of such deficiency or complained of matter.”
 

 [14]
 

 Here is the text:
 

 “Should Lessee at any time default in or fail to perform or observe any of its obligations under this Addendum Paragraph 56, Lessor shall have the right, but not the duty, without limitation upon any of the Lessor’s rights pursuant hereto, to perform the same, and Lessee agrees to pay to Lessor on demand, all costs and expenses incurred by Lessor in connection therewith, including without limitation, attorneys’ fees, together with interest from the date of expenditure at the current market rate.”
 

 [15]
 

 Here is the text:
 

 “Lessee hereby indemnifies Lessor and agrees to defend with counsel selected by Lessor and hold Lessor harmless for any loss incurred by or liability imposed on Lessor by reason of Lessee’s failure to perform or observe any of its obligations or agreements under this Addendum Paragraph 56, including but not limited to any damage, liability, fine, penalty, punitive damage, cost or expense (including without limitation all clean up and removal costs and expenses) arising from or out of any claim, action, suit or proceeding for personal injury (including sickness, disease or death), tangible or intangible property damage, compensation for lost wages, business income, profits, or other economic loss, damage to the natural resources or the environment, nuisance, pollution, contamination, leak, spill, release or other adverse effect on the environment.”
 

 [16]
 

 Here is the text:
 

 “Lessor may enter the Premises at any time, without notice for the purpose of ascertaining compliance by Lessee with the requirements of this Addendum Paragraph 56.”
 

 [17]
 

 It is probably impossible for
 
 any
 
 office to conduct operations without some “use” of toxic materials. This court, for example, uses great amounts of toner in its photocopying machines and computer printers.
 

 [18]
 

 SDC’s best evidence was one sample in the open drum storage area which yielded 4,400 parts per billion of 1,1,1 trichloroethane (TCA). While 1,1,1 trichloroethane is a substance which, as we noted in
 
 People
 
 v.
 
 Hale
 
 (1994) 29 Cal.App.4th 730,
 
 737
 
 [34 Cal.Rptr.2d 690], has been routinely classified as hazardous, SDC’s own expert report described it as “not a suspected human carcinogen.” For the moment we need only note that 4,400 parts per
 
 billion
 
 here is somewhat less than the 23,000 parts per
 
 million
 
 found toxic in
 
 Hale.
 

 [19]
 

 Here, while the parties have not addressed the respective cost of curative action in relation to the total reserved rent, the very fact that disproportionality is an important factor favors Tolo’s reading of the subject clause. And we note the irony, in that regard, that a proposal obtained by SDC proposed to do no more than clean up the soil to 15 parts per billion or less, which is a level of pollution
 
 higher
 
 than most of the soil samplings at the site anyway.
 

 [20]
 

 The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 et seq.) was passed by a lame-duck Congress in 1980. As one commentator has noted, courts routinely blame the act’s poor drafting on the haste of the act’s passage. (See Nagle, A
 
 Twentieth Amendment Parable
 
 (1997) 72 N.Y.U. L.Rev. 470, 490; for a compendium of federal decisions criticizing CERCLA’s drafting, see
 
 id.
 
 at p. 490, fn. 94.)
 

 [21]
 

 Elsewhere it said that the argument had “some force.” (964 F.2d at p. 261, fn. 13.)