Filed 5/11/22  Izzy's Deli v. LMA & SAI 1433 Wilshire CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| IZZY'S DELI, | B306162, B306180 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. Nos. SC129964, 18SMCV00315) |
| v. | |
| LMA & SAI 1433 Wilshire LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elaine W. Mandel, Judge.  Affirmed.

Cozen O'Connor, Frank Gooch III, Matthew E. Lewitz; Klapach & Klapach and Joseph S. Klapach for Defendant and Appellant.

Mitchell Silberberg & Knupp, Stephen E. Foster, and Andrew C. Spitser for Plaintiff and Respondent.

Does a tenant leasing commercial property or the property's owner bear the financial burden of complying with a 2017 local ordinance that requires seismically retrofitting a building?  That is the question we are asked decide, and the answer turns on whether the leasing arrangement in this case—which includes an early termination provision in the property owner's favor—is more like the arrangement in *Hadian v. Schwartz* (1994) 8 Cal.4th 836 (owner held responsible) (*Hadian*) or *Brown v. Green* (1994) 8 Cal.4th 812 (tenant held responsible) (*Brown*).

## I.  BACKGROUND

### A.  *The Commercial Lease and Its Subsequent Extensions and Amendments*

#### 1.  *The original 1973 lease*

In 1973, property owners Ernest and Lisa Auerbach agreed to lease commercial property located at 1429-33 Wilshire Boulevard in Santa Monica, California (the premises) to Kenny's Deli.  Kenny's Deli is the predecessor company to plaintiff and respondent Izzy's Deli (Izzy's).  (For simplicity's sake, we will refer to both companies as Izzy's in the remainder of this opinion.)  Ownership of the premises was ultimately conveyed from the Auerbachs to defendant and appellant LMA & SAI 1433 Wilshire LLC (LMA).  (Again, for simplicity, we will refer to the owner of the premises as LMA without distinction.)

The term of the original 1973 lease was 15 years: from June 1973 to May 1988.  The lease specified the premises was to "be used and occupied only for a delicatessen, restaurant and catering business."  Izzy's was obligated to pay base rent of $438,000 in specified monthly installments.  LMA was to receive

2

the rent "free and clear of any and all other impositions, taxes, liens, charges or expenses of any nature whatsoever in connection with the ownership and operation of the [p]remises." Additionally, Izzy's was to pay "all impositions, insurance premiums, operating charges, maintenance charges, construction costs, and any other charges, costs and expenses which arise or may be contemplated under any provisions of this Lease during the term hereof."[1]

Section 6 of the lease, governing "[u]se," generally discusses compliance with applicable law. It requires Izzy's to promptly comply with "all applicable statutes, ordinances, rules, regulations, orders and requirements in effect during the term or any part of the term hereof regulating the use by [the lessee] of the [p]remises" at its own expense. Izzy's also accepted the premises in the condition existing as of the date the lease was executed, "subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the [p]remises . . . ."

Section 7 of the lease, governing "[m]aintenance, [r]epairs, and [a]lterations," obligated Izzy's to "keep in good order, condition and repair, the [p]remises and every part thereof, structural or non-structural, and all adjacent sidewalks, landscaping, driveways, parking lots, fences and signs located in

---

[1] The lease also stated Izzy's must pay additional rent in an amount equal to 6 percent of its gross sales during each month of the term, less the aggregate amount of the minimum monthly rent paid that month. It is undisputed this gross profits percentage was never paid during the life of the lease and all of the later extensions.

3

the areas which are adjacent to and included with the [p]remises." It further provides LMA would "incur no expense nor have any obligation of any kind whatsoever in connection with maintenance of the [p]remises" and that Izzy's waived the benefits of any statute which would afford it the right to make repairs at LMA's expense. The lease provided, however, that except for damage caused by Izzy's, LMA would be responsible for keeping the exterior roof of the premises in good order.

Section 7 additionally prohibits Izzy's from "mak[ing] any alterations, improvements, additions, or utility installations in, on or about the [p]remises, except for non-structural alterations not exceeding $1,000.00 in cost" without LMA's consent. Further, any alterations, improvements, additions or utility installations made upon the premises would become LMA's property at the expiration of the lease term.[2]

Other provisions of the lease established who would pay for certain expenses. Izzy's was to pay the cost of all required insurance (i.e., a comprehensive public liability policy and property insurance) as additional rent. Izzy's was also obligated to indemnify LMA against any claims arising from Izzy's use of the premises and conduct of business. In the event improvements on the premises were damaged or destroyed, Izzy's was to "repair, restore, and rebuild the [p]remises to their condition existing immediately prior to such damage or destruction," with the lease continuing in full force and effect. LMA would pay real property taxes for the premises, but Izzy's

---

[2]     Izzy's machinery and equipment "other than that which is affixed . . . so that it cannot be removed without material damage to the [p]remises" remained Izzy's property.

4

was to pay any increases in real property taxes imposed after the 1973 to 1974 fiscal year.

Finally, the lease provided LMA's consent was required for Izzy's to assign, transfer, mortgage, sublet, or otherwise transfer or encumber any of its interest in the lease or the premises.

### 2.      *Early amendments to the lease*

The parties signed the first amendment to the lease in July 1975.  Pursuant to the first amendment, the furnishings and fixtures used in operation of the deli were assigned to LMA for the duration of the lease.  The amendment also gave LMA the right to use the lease as collateral to obtain a loan.

The parties executed a second amendment to the lease in February 1988.  Pursuant to the second amendment, the parties agreed to extend the lease an additional fifteen years, from June 1988 through May 2003.  The second amendment increased the base monthly rent to $10,000 per month, and that amount would be increased annually pursuant to an agreed-upon formula. Izzy's was also to pay the cost of all required insurance, any real property taxes in excess of the real property tax bill for the 1973-1974 fiscal year, and any increase in property taxes as a consequence of a transfer or change in ownership of the premises. The second amendment also amended paragraph 7.1 of the lease to provide that, going forward, Izzy's would be responsible "for keeping the entire premises, including, but not limited to, the interior and exterior roof, in good order, condition and repair."

### 3.      *The third amendment*

The parties executed a third amendment to the lease in December 1992.  The third amendment reduced the amount of

5

rent Izzy's would pay in 1993 and set the amount of rent that would be paid in 1994.

More important for our purposes, the third amendment to the lease added new language that would permit LMA to terminate the lease before the expiration of the agreed-upon term if certain contingencies concerning one of Izzy's founders and its then owner, Israel Freeman (Freeman), occurred. Specifically, the lease as amended provided that "[i]n consideration of the rent reduction . . . and acknowledging that the personal involvement of . . . Freeman in the restaurant business conducted by [Izzy's] . . . is essential to the continued success of [Izzy's], the parties agree[d]" (among other things) that "any sale, transfer or other conveyance by . . . Freeman, whether voluntarily, involuntarily or by operation of law, of thirty-five percent (35%) or more of his shares of stock of [Izzy's] shall be deemed to constitute an assignment of the Lease." Relatedly, the lease amendment provided that in the event Izzy's "voluntarily, involuntarily or by operation of law" assigned the lease, sublet all or any portion of the premises, or transferred or conveyed substantially all of its assets, Izzy's would have to provide written notice to LMA and LMA would have the right, at its "sole and absolute discretion" to elect to terminate the lease in 30 days.

### 4. *The fourth and fifth amendments*

The parties executed a fourth amendment to the lease in May 2003.[3] The fourth amendment extended the term of the

---

[3] The fourth amendment specified that "[e]xcept as hereby amended, the Lease shall remain in full force and effect, and, in the event of a conflict between a provision contained in this Fourth Amendment and a provision contained in the Lease, as

6

lease an additional 15 years, from June 2003 to May 2018—with an option to further extend the lease for an additional five years to May 2023. Beginning in June 2003, the fourth amendment required Izzy's to pay the entire annual property tax bill for the premises. Izzy's was also responsible for maintaining the general liability insurance required by the second amendment to the lease and for reimbursing LMA for the cost of any insurance LMA elected to maintain with respect to the premises. Izzy's further agreed that it must keep the premises in good order, condition, and repair at its own expense, and that LMA would "not be required to contribute in any manner."

Later, in March 2009, the parties executed a fifth amendment to the lease. The fifth amendment extended the lease for an additional ten years, from June 2018 to May 2028—with an option for Izzy's to extend the lease for an additional five years to May 2033, which Izzy's exercised in December 2016.

B.     *Santa Monica Ordinance No. 2537*

In March 2017, the City of Santa Monica adopted Ordinance No. 2537 (the Santa Monica Ordinance), which updated certain seismic retrofit standards and adopted mandatory seismic retrofit requirements. The Santa Monica Ordinance ordered owners of buildings that fell within the scope of the ordinance to comply with the newly adopted seismic retrofit requirements. The City of Santa Monica contends the Santa Monica Ordinance applies to the building located on the premises.

_____

heretofore amended, the provision contained in this Fourth Amendment shall govern and control."

7

## C.    Litigation Over Who Must Pay for Santa Monica Ordinance Compliance

After enactment of the Santa Monica Ordinance, a dispute arose between Izzy's and LMA regarding who must pay for the seismic retrofitting of the building on the premises.  The dispute soon blossomed into competing lawsuits.

LMA filed an unlawful detainer complaint against Izzy's in October 2018.  LMA contended Izzy's had failed to comply with a "Thirty-Day Notice to Perform Covenants or Quit," served on Izzy's and Freeman, that demanded Izzy's agree in writing that it was responsible to pay for all seismic retrofit costs and expenses associated with the Santa Monica Ordinance.

Two months later, Izzy's sued LMA seeking declaratory relief.  Izzy's complaint disputed it was responsible for paying costs and expenses associated with Santa Monica Ordinance compliance and sought a declaration so stating.  Izzy's further alleged LMA believed it was entitled to unilaterally determine the nature and scope of the seismic retrofit upgrade work and Izzy's sought a declaration that, if it were required to pay for some or all of the work, it was nevertheless entitled to select and retain professionals to design and perform the work, including in a manner that would not unreasonably interfere with its business.

The trial court consolidated the unlawful detainer and declaratory relief actions for purposes of trial.

## D.    Trial

The parties stipulated to bifurcate the trial so that the issue of whether LMA or Izzy's was responsible for costs of compliance with the Santa Monica Ordinance was tried first.

The trial court held a two-day bench trial to decide the issue in February 2020. The witnesses who testified were Freeman; Helayne Levy, a real estate consultant; William Hughes, a commercial general contractor; and Lorna Auerbach, the Auerbachs' daughter.

### 1.     *Freeman's testimony*

Freeman was 80 years old at the time of trial and suffered from health problems, including being at risk of suffering a stroke.

Freeman testified he did not read the lease or any of its amendments before signing them. He explained Ernest Auerbach was his partner and friend, and whatever he wanted was fine with Freeman. Freeman assumed the lease was drafted by Ernest Auerbach's attorney because he said he would have an attorney draw up an extension that Freeman requested.

Freeman described various times Ernest Auerbach either paid for or contributed to repairs for Izzy's. In 2007, he paid for at least half of the remodel of a bathroom at Izzy's. Earlier, in or around 2001, he paid the legal fees related to a lawsuit over Izzy's parking rights. He also paid for damage to some tiles on the exterior of the deli that were damaged in the 1994 Northridge earthquake.

### 2.     *Hughes's testimony*

William Hughes, a commercial general contractor who prepared a bid for the seismic retrofit of Izzy's (he had not been hired by the time of trial), opined about certain work required as part of the retrofit. Hughes's bid, which was based on preliminary documents designated as "not for construction," was

9

$462,369.  That bid did not include, however, the cost of reroofing the premises,[4] which Hughes testified would be necessary, nor did it include improvements to comply with the Americans with Disabilities Act that Hughes knew the City of Santa Monica would require.  Hughes had not prepared an estimate of the total cost to perform all of the work Santa Monica would require in connection with performing the seismic retrofit upgrade.

Hughes estimated his work would take 12 to 14 weeks to complete.  It would involve, among other things, drilling into concrete, tying in structural steel plates, and adding bracing to the walls.  Hughes asserted they would need to do the work in the daytime but could "do a big part of it off hours."  Based on his inspection of the premises, Hughes stated he would attempt to do the work "from above" (i.e., above the acoustical ceiling) such that Izzy's—which operated as a 24-hour deli—could remain open.[5] But he conceded the actual impact of the work on Izzy's operations was "to be determined."

Hughes believed the seismic retrofit work on the building situated on the premises would extend its life "a long time" (assuming no intervening earthquake) and the contemplated work on the roof would extend it about 20 years.

---

[4]     The record includes a separate bid for roofing work in the amount of $72,000.

[5]     On the other hand, LMA submitted a report to the city representing that based on LMA's plans, "the [d]eli operation would have to be closed during retrofit construction" and Izzy's was opposed to closing.

10

### 3. *Levy's testimony and facts judicially noticed*

Helayne Levy, a consultant for Auerbach Realty, testified that in May 2018, LMA took out a loan secured by the premises in the amount of $1.25 million and executed a deed of trust.

The trial court took judicial notice of an actuarial table from the Social Security Administration. The actuarial table provided the life expectancy of an 80 year old man was 8.34 years. The court also took judicial notice of the fact that large earthquakes occurred in Sylmar in 1971, in Whittier Narrows in 1987, and in Northridge in 1994.

### E. *The Trial Court's Ruling*

At the conclusion of trial, the trial court orally found in Izzy's favor. The court subsequently issued a statement of decision elaborating on its reasons.

The trial court believed there was no specific language in the lease or its amendments identifying which party must pay for seismic retrofit upgrades and determined it should apply the two-part test described in *Hadian* and *Brown* to decide who bore responsibility to pay for the retrofit work. (See generally *Hadian, supra*, 8 Cal.4th at 845-849 [a court considers, first, whether the life of the lease and the extent to which it transfers the incidents of full ownership of the property suggests that a tenant is made responsible for paying for seismic retrofit work; and, if so, a court then considers six factors first discussed in *Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 Cal.2d 666, 674 (*Sewell*) that are intended to illuminate whether, despite the use of unqualified language in the lease, the parties really did intend the tenant would assume that responsibility].)

11

At the first step, the trial court concluded the lease did not pass "substantially all of the responsibilities of property ownership" or "the incidents of full ownership" of the premises to Izzy's.  The court pointed to LMA's retention of control over the type of business Izzy's was allowed to operate (including even what type of signage was permitted), Izzy's inability to sublease the premises without LMA's consent, and the provisions of the lease that deem LMA the owner of furnishings and fixtures installed by Izzy's.  The court also found it significant that LMA took out a $1.25 million loan secured by the premises because the premises would be forfeited and the lease terminated if LMA did not timely repay the loan.

At the second step, the trial court found the *Sewell* criteria[6] similarly counseled in favor of finding LMA responsible for the cost of seismic retrofit work.  The court believed the analytically relevant lease term was the length of the current (fifth) lease amendment and that term, though 15 years on paper, was uncertain and could be quite short: the lease provided LMA could unilaterally terminate it if and when Freeman died or otherwise

[6]     The criteria are: (1) the relationship of the cost of compliance with a government mandate to the "rent reserved," i.e., the total rent payable over the lease; (2) the length of the lease; (3) the relative degree to which the tenant or the owner would benefit from the compliance work to be done; (4) whether the compliance work is structural or nonstructural in nature; (5) the degree to which compliance work will interfere with the tenant's operations; and (6) the likelihood that the parties contemplated the application of the particular ordinance or government mandate involved.  (*Hadian, supra,* 8 Cal.4th at 847-849.)

transferred 35 percent of his ownership share of Izzy's. LMA, in the court's view, had not proven what the cost of compliance with the Santa Monica Ordinance would be (Hughes's bid was "incomplete"), and the amount of rent reserved could not be calculated due to the aforementioned uncertainty in the lease term. The trial court further found: the structural retrofit work would confer comparatively greater benefits on LMA, including for many years after the termination of the lease; there were some structural and some non-structural elements to the anticipated work; Hughes's testimony as to the length of the proposed work and its lack of interference with Izzy's business was unpersuasive and did not appear to be based upon well-founded assumptions about the nature and extent of the interference; and, when the lease amendments were drafted and executed, the parties had sufficient information that they could have contemplated a potential need for seismic retrofitting and who would pay for it, but no such term was included in the amendments even though the amendments were drafted by LMA's attorneys.

In line with its stated rationale, the court subsequently entered a judgment concluding LMA failed to meet its burden of proof on the unlawful detainer claim and Izzy's was entitled to remain in possession of the premises, Izzy's prevailed on its claim for declaratory relief, and LMA was responsible for paying all the costs and expenses associated with bringing the building on the premises into compliance with the Santa Monica Ordinance. The court further found Izzy's was the prevailing party and entitled to costs and attorney fees in an amount to be determined.

13

## II. DISCUSSION

The circumstances in this case, including features of the lease itself, are closer to the *Hadian* end of the spectrum defined by our Supreme Court, not the *Brown* end. The law places the burden of compliance with laws like the Santa Monica Ordinance on a property owner like LMA unless both of the following are true: (1) the terms of the commercial lease in question—including the length of the lease and the extent to which it transfers indicia of full ownership to the tenant—appear to place the burden on the tenant, not the owner; and (2) consideration of the six judicially developed *Sewell* criteria cited in *Brown* and *Hadian* confirms both parties to the lease did actually intend the tenant to be responsible for the expense of compliance. (*Hadian*, *supra*, 8 Cal.4th at 845-847; *Brown*, *supra*, 8 Cal.4th at 825-826.) As we will explain, the facts here bearing on the first of these considerations are somewhat equivocal: the length of current lease term, while facially a 15-year term that *Brown* would otherwise consider "long," is made uncertain by the clause permitting LMA to terminate the lease early if the Freeman contingencies occur; there are also some significant indicia of ownership that the lease withholds for LMA. Consideration of the *Sewell* criteria, however, tips the balance in Izzy's favor and leaves us convinced the parties intended LMA to shoulder the burden of complying with the Santa Monica Ordinance.

### A.     *Applicable Law*

#### 1.     Brown *and* Hadian*'s two-step inquiry*

In 1994, our Supreme Court issued two opinions—*Brown* and *Hadian*—that address whether the owner of a commercial building or its tenant bears the financial responsibility of

14

complying with government-ordered alterations.  Both *Brown*, which involved an order requiring asbestos remediation, and *Hadian*, which involved an order requiring seismic retrofitting, address the scenario we confront in this case: one in which a lease contains a clause requiring the lessee to comply with applicable laws regulating the lessee's use of the property (a compliance with law clause), a governmental entity issues an order requiring some significant work to be done to the property, and the governmental compliance order was not issued as a result of the lessee's particular use of the property.  (See *Brown, supra,* 8 Cal.4th at 823-826; *Hadian, supra,* 8 Cal.4th at 843-844.)

In this scenario, *Brown* holds the tenant's use of the property "lies outside the literal scope of the compliance with laws clause," and it is necessarily "unclear from [such a clause], standing alone, how the parties intended to allocate the risk of compliance with respect to government orders arising from property conditions *unrelated* to a particular use by the [tenant].  In the face of that ambiguity, [a court] may properly consider other relevant provisions of the lease as well as the factors employed by the courts to determine the intent of the parties to a nonresidential lease . . . ." (*Brown, supra,* 8 Cal.4th at 826.)

The consideration that Brown requires notwithstanding the inclusion of a general compliance with laws clause in a commercial lease proceeds according to the two-step procedure we already summarized.  As stated in *Hadian*:  "[T]he analysis begins with the language of the lease itself.  The literal text of the agreement . . . is presumptively controlling in determining the intent of the parties . . . .  If . . . the language of the lease appears to place the duty of compliance on the lessee, the court then takes

15

the second analytical step.  It examines the lease terms in light of a handful of judicially developed circumstantial factors as a means of confirming that the allocation of risk suggested by the text of the lease accurately reflects the probable intent of the parties and leads to a reasonable construction of the lease terms. [Citation]  [¶]  If, on balance, these factors *reinforce* the conclusion suggested by an examination of the text of the lease, the court will conclude that the obligation to make alterations to comply with the law or regulation at issue falls on the lessee. If, however, the assessment is inconsistent with the lease provisions and points to the conclusion that the parties intended that the lessor shoulder the burden of compliance, the court will conclude that the actual agreement of the parties deviates from the literal text of the lease and construe and enforce the agreement accordingly." (*Hadian, supra*, 8 Cal.4th at 844-845; see also *Brown, supra*, 8 Cal.4th at 829-830.)

### 2. *The specific facts and holding in* Brown

The lease at issue in *Brown* was for a term of 15 years at a monthly rent of $28,500.  (*Brown, supra*, 8 Cal.4th at 819.)  The tenants in *Brown* agreed to pay annual property taxes and obtain and pay premiums for liability insurance on the building.  (*Id.*)  The lease contained a compliance with law clause that required the lessee to comply with applicable laws "'*regulating the use* by the [l]essee of the premises.'"  (*Ibid.*)  It also contained a repair clause that provided the lessee would "'keep in good order, condition and repair the Premises and every part thereof, *structural* and non-structural . . . .' [ ]"  (*Ibid.*)  The *Brown* lease further stated the property owner had no obligation to repair or maintain the premises and provided the tenant would hold the

16

owner harmless against any claims arising out of the use of the property during the term of the lease. (*Id.* at 819-820.)

The tenant opened a retail furniture store on the premises and later sublet the property to another furniture store. (*Brown*, *supra*, 8 Cal.4th at 820.) Approximately two years into the lease term, the county Department of Health Services found evidence of asbestos contamination and directed it be abated. (*Ibid*.) The estimated cost of the environmental cleanup was $251,856. (*Id.* at 821.)

In conducting the first part of the analysis to determine which party bore the burden of paying for the asbestos remediation, our Supreme Court considered the provisions of the lease "as a whole," noting in particular the 15-year term of the lease, the tenant's agreement to pay property taxes and assume the risk of third party liability, the broad repair clause, the owner's negative covenants with respect to any obligation to maintain or repair the property, and the elimination of any warranties on the part of lessor. (*Brown*, *supra*, 8 Cal.4th at 828.) Considering all of these, our Supreme Court concluded "[f]inancial considerations implicit in the text of the lease agreement make it clear that [the owner] negotiated a 'net' lease," which "'presumes the landlord will receive a fixed rent, without deduction for repairs, taxes, insurance, or any other charges, other than landlords' income taxes.'" (*Id.* at 827.) The court also held it was "reasonably clear *from the four corners of the agreement* itself that the parties intended to transfer from the lessor to the tenants the major burdens of ownership of real property over the life of the lease." (*Id.* at 828.)

In conducting the second part of its analysis, the court determined four of the six *Sewell* factors militated in favor of

17

finding the tenants must pay for the asbestos remediation: the estimated cost of the work was less than 5 percent of the total rent reserved over the life of the lease; the 15-year lease qualified as a long term lease under the circumstances; the remediation was structural but the lease shifted responsibility for repairs to the tenants; and both parties had notice of the possibility that asbestos remediation might be necessary, which was significant partly because the tenants had substantial experience in the retail industry.[7] (*Brown, supra,* 8 Cal.4th at 830-834.)

### 3. *The specific facts and holding in* Hadian

The lease in *Hadian* was a three-year lease at a rate of $650 per month, with an option to renew for an additional five years at $800 per month. (*Hadian, supra,* 8 Cal.4th at 840.) Pursuant to the lease, the tenant agreed to pay any increase in property taxes during the term of the lease, agreed to comply with all applicable laws "'regulating the use by the lessee of the premises,'" and agreed to accept the building in its condition existing at the time the lease commenced. (*Id.* at 841.) The lease also required "the [tenant] to 'keep in good order, condition and repair the Premises and every part thereof, structural and nonstructural . . . including . . . all . . . walls (interior and exterior), foundation, ceiling, roofs (interior and exterior),

---

[7]     As to the remaining two factors, the court found the work would substantially benefit both parties (because the hazardous material was discovered in the third year of the 15-year lease) and the work would not interfere with the tenant's use of the property to such a degree as to weigh heavily in favor of finding the lessor had the responsibility to fund the work. (*Id.* at 832.)

floors . . . .'" (*Ibid.*) The lease additionally stated the property owner had no obligation to repair or maintain the premises. (*Ibid.*)

The tenant exercised the five-year option to renew the lease. (*Hadian*, *supra*, 8 Cal.4th at 841.) Approximately five months later, and five months before the end of the initial three-year lease term, the City of Los Angeles advised the property owner that it was required to seismically retrofit the building. (*Ibid.*) The owner paid the costs of a survey, redesign of the building, and the actual retrofit, which totaled $34,450.26. (*Id.* at 841-842.) The parties disagreed over who was responsible for the costs, and the owner ultimately sued. (*Ibid.*)

In analyzing the lease itself, our Supreme Court acknowledged the lease in *Hadian* was "virtually identical" to the lease in *Brown* but held, on balance, the tenant in *Hadian* had not intended to create a true net lease. (*Hadian*, *supra*, 8 Cal.4th at 846.) The court emphasized the three-year lease with an option to renew for five years was for a comparatively short term, the property owner was responsible for paying all but a small yearly increment in property taxes and for obtaining and paying for insurance, and the property owner continued to own the fixtures, operating systems, and improvements in the building. (*Ibid.*)

Proceeding to consider the *Sewell* factors, the court believed they on balance revealed the parties intended the property owner would be responsible for complying with laws unrelated to the particular use the lessee made of the property. The court reasoned four factors favored exempting the tenant from paying for the seismic retrofitting: the estimated cost of the work was 145 percent of the rent reserved over the initial three-year term

19

of the lease and 49 percent if the court added the five years of the option to the term; the three year term was short and the five year renewal option did not change that analysis; the primary benefit of the seismic retrofit work would inure to the owner; and the substantial retrofitting required would be intrusive and thus did not count in the property owner's favor. (*Hadian*, *supra*, 8 Cal.4th at 847-849.) The remaining two factors, in the court's view, seemed to be neutral: the work was structural in nature, but the court did not say whether that favored either party; and the owner could be charged with a general awareness of the possibility that the government might demand seismic renovation, but that factor did not tip decidedly in favor of either party. (*Id.* at 848-849.)

Having held that the tenant was not responsible for the seismic retrofitting, the Supreme Court also highlighted the facts explaining the divergent result in *Brown*. In the court's view, "[t]he material features of the lease and surrounding circumstances in this case and those in *Brown* [ ]differ[ed] with respect to almost every controlling factor: [d]ifferences in the amount of the monthly rent ($28,500 *versus* $800), the life of the lease (fifteen years *versus* three years, with a five-year option), the cost of compliance alterations as a percentage of the aggregate rent (less than 5 percent *versus* 49 percent), prior notice of the potential for compliance problems (written notice in *Brown* [ ], none in this case)[,] and the extent of the alterations entailed by compliance (removing fireproofing material sprayed on beams supporting the roof *versus* a virtual reconstruction of the building, including steel framing and reroofing) . . . ." (*Hadian*, *supra*, 8 Cal.4th at 850.)

20

B.	*The Language of the Lease Here Is Not Decisive: Some Elements Are Closer to* Brown *While Others Are Closer to* Hadian

The original lease between Izzy's and LMA includes a compliance with law clause stating "[tenant] shall, at [tenant's] expense, comply promptly with all applicable statutes, ordinances, rules, regulations, orders and requirements in effect during the term or any part of the term hereof regulating the use by [tenant] of the [p]remises." Like the compliance with law clauses in *Brown* and *Hadian*, this clause limits the duty of compliance to laws that regulate the "*use* of the property" and applies only where the lessee's particular use of the property leads to the government's compliance order. (*Brown*, *supra*, 8 Cal.4th at 824.) That is not the case here; the Santa Monica Ordinance, which requires significant seismic retrofitting of the property, applies to the premises because of the type of building it is, not because of how Izzy's is using it. Inclusion of a compliance with law clause therefore does not decide the issue and we undertake the same analysis as in *Hadian* and *Brown*.

We first address whether the lease transfers from LMA to Izzy's the "major burdens of ownership of real property over the life of the lease." (*Brown*, *supra*, 8 Cal.4th at 828.) We look at the lease as a whole, paying particular attention to "the life of the lease and the extent to which the incidents of full ownership of the property are transferred to the lessee." (*Hadian, supra*, 8 Cal.4th at 846.)

As we have already described, the original lease was extended through a series of amendments over decades. The original lease specified a term of 15 years. The second and fourth amendments each extended the term an additional 15 years, and

21

the fifth amendment extended it yet another 10 years, with an option to extend for five more. LMA contends this means the lease is a long-term, 60-year lease.[8] Izzy's argues only the current lease term, as extended, is relevant. Izzy's has the better argument under the circumstances.

While Izzy's has continuously occupied the premises since the initial lease term began in 1973, each amendment that provided an extension of the lease term created a new, additional lease term that was independent of the term that came before it. This is underscored by the language the amendments used to define those terms, each of which looked forward to the next term prospectively. None of them acted retrospectively to encompass past years within the extended lease term.[9]

---

[8] LMA argues the "60-year lease" qualifies as a "'change of ownership'" for purposes of property tax reassessment. LMA misreads the case law, which provides that a change in ownership occurs only when a the prospective, or remaining, term of a lease is 35 years or more. The past, or expired, portion of the leasehold does not count. (See *Dyanlyn Two v. County of Orange* (2015) 234 Cal.App.4th 800, 813-814; *McDonald's Corp. v. Board of Supervisors* (1998) 63 Cal.App.4th 612, 616.) At no time did any current or prospective lease term extend for 35 years or more.

[9] Furthermore, even if the lease were evaluated over the entire 60-year period, we would still find it quite significant that the Santa Monica Ordinance was not enacted until 2017, approximately 44 years after the original lease was signed and years after even the most recent amendment. That would be additional reason to train our focus on the most recent extension of the lease.

So we focus on the current lease term: a ten-year term with an option to extend for an additional five years, which Izzy's exercised in 2016. But, as we know, that is only part of the story. The current lease permits LMA to terminate the lease if Freeman transfers 35 percent or more of his interest in Izzy's. This renders the lease term significantly uncertain if for no other reason than Freeman's death would necessarily result in such a transfer and actuarial tables judicially noticed by the trial court establish he is unlikely to live much beyond 2028, particularly with the health challenges he described during his testimony. With this added uncertainty, the lease here cannot be described as "long" in the same way that the lease in *Brown* was long— even if it ultimately does not turn out to be quite as short as the three-year-with-a-five-year-option term in *Hadian*.

Turning to the lease's other relevant provisions, the current lease does include some of the same features that the court in *Brown* highlighted as transferring the incidents of ownership. The rent provision of the lease is styled as a "net" lease, a characterization that is informative but not decisive. (*Brown*, *supra*, 8 Cal.4th at 828.) Izzy's is responsible for keeping the structural and non-structural aspects of the premises in good condition and repair, and Izzy's also must repair, restore, or rebuild the premises if the improvements are damaged or destroyed.[10] (*Ibid.* [unqualified nature of repair clause is one feature of the lease indicating an intent to transfer major burdens of ownership].) Izzy's has been responsible for paying insurance costs and the full property tax bill for the premises

---

[10] Since June 1988, Izzy's has also been responsible for the entire premises, including the exterior roof.

23

since June 2003. (*Ibid.* [agreement to pay property taxes and insure against risk of third party liability also indicated intent to transfer major burdens of ownership].)

On the other hand, the terms of the lease undisputedly retain at least one notable hallmark of ownership for LMA: any alterations, improvements, additions, or installations on the premises made by Izzy's would become LMA's property at the expiration of the lease term and furnishings and fixtures related to the operation of the deli were assigned to LMA for the duration of the lease. (*Hadian, supra*, 8 Cal.4th at 846 [clause providing lessor continued to own all fixtures, operating systems, and improvements undermined view that parties intended true net lease].) We additionally believe the trial court did not err in finding additional features of the lease and the parties conduct relevant, including control of the type of business Izzy's may operate, a prohibition on nonconsensual subleasing, and LMA's use of the premises as security for a loan taken out in 2018. But we accord these facts only marginal relevance because they do not fall within the categories of ownership expressly discussed in *Brown* or *Hadian*.

On balance, then, there are some indications the parties intended to transfer the burdens of ownership to the lessee (the repair provision and allocation of insurance and property tax payments) and some that they did not (the uncertain lease term and the lessor's ownership of the fixtures and improvements). If we had to resolve the appeal solely on the basis of the first step of the *Hadian* and *Brown* inquiry, it would be a close call. Fortunately, we do not. As we next explain, consideration of the *Sewell* factors tips the analytical balance and leaves us convinced LMA must pay the seismic retrofitting costs.

24

*C.*     *Consideration of the* Sewell *Factors Reveals an Intention to Shoulder LMA with the Burden of Seismic Compliance*

"Whether the parties actually intended the allocation of responsibilities suggested by the use of unqualified language in a lease is an inquiry better approached through the application of a handful of relevant factors than by a "four corners" analysis of the text that focuses exclusively on the interlocking provisions of the agreement itself and their legal consequences." (*Brown, supra*, 8 Cal.4th at 829.)  As instructed, we therefore consider: (1) the relationship of the cost of the curative action to the rent reserved; (2) the term for which the lease was made; (3) the relationship of the benefit to the lessee to that of the reversioner; (4) whether the curative action is structural or nonstructural in nature; (5) the degree to which the lessee's enjoyment of the premises will be interfered with while the curative action is being undertaken; and (6) the likelihood that the parties contemplated the application of the particular law or order involved.  (*Id.* at 830-834; *Hadian, supra*, 8 Cal.4th at 847-850.)

*1.*     *Relationship of the cost of the curative action to the rent reserved*

"The relationship between the cost of compliance and the aggregate rent payable over the life of the lease is . . . a significant factor in divining the probable intent of the parties and determining which of them agreed to bear the burden of compliance. . . . It is, after all, highly unlikely that a lessee would intend or expect to assume a repair/compliance burden that is,

25

say, equal to or even a substantial fraction of the total rent over the life of the lease." (*Brown*, *supra*, 8 Cal.4th at 831.)

The analysis of this relationship is context-dependent. In *Brown*, for example, the analysis suggested the parties intended the lessee bear the burden of compliance because the "hazardous condition [was] discovered relatively early in a long-term lease, the total rent reserved over the life of the lease [was] a very high multiple . . . of the cost of disposal, and the provisions of the lease agreement otherwise suggest that the parties intended that the lessees assume the major burdens of ownership." (*Brown*, *supra*, 8 Cal.4th at 831.)

Our analysis of this factor is hindered by the absence of a more definitive record on the cost of complying with the Santa Monica Ordinance and the amount of reserved rent. At trial, there was no comprehensive estimate of the cost of all the required work; the best we can say, from the evidence presented, is the work would cost at least $500,000. The record also does not reveal the exact amount of the rent reserved over the term of the lease. The only evidence in the record indicating the amounts paid are the lease and amendments, which dictate the base rent to be paid at the beginning of each lease term.[11] Those numbers

---

[11] LMA argues in its brief that Izzy's either has paid or will pay approximately $8.7 million in rent, insurance premiums, and property taxes (the latter of which were also defined as rent in the lease). In support of this argument, LMA cites to the lease and amendments, which provide limited information about the exact rent due each month of the lease term, plus three exhibits the trial court ruled inadmissible at trial. We will not consider any evidence that was not admitted by the trial court. (See *USLIFE Savings & Loan Assn. v. National Surety Corp.* (1981) 115 Cal.App.3d 336, 343.) Accordingly, the record is devoid of

do not account for yearly increases in rent or the other expenses the tenant agreed to pay as rent on the property. Further, as already mentioned, the current lease term is uncertain because LMA has the unilateral option to terminate the lease if Freeman transfers 35 percent or more of his interest in the deli, voluntarily or involuntarily.

All that said, the limited information we do have permits drawing some conclusions. The lease provides a base rent for the current term of $10,000 per month. At that rate, the estimated seismic retrofit costs would be equivalent to somewhere around five years of rent. Viewed from the perspective of what is putatively a ten-year lease with a five-year option to extend that effectively has an uncertain end date, we believe this amount (and, we can infer, the hardship it would impose on Izzy's) is significant.

### 2. *The term for which the lease was made*

The term of the lease is relevant because a longer term lease provides a tenant with a longer period of time over which to amortize the costs of unexpected work. (*Brown, supra*, 8 Cal.4th at 832.) What we have already said in discussing the length of the lease at step one of the *Hadian* and *Brown* inquiry applies equally here. Izzy's cannot fully plan to amortize seismic retrofitting costs over the remaining portion of the current lease term because of the early termination provision we have discussed. The term of the lease therefore cannot be considered "long" even if it is not as short as the term in *Hadian*.

---

evidence demonstrating the precise amounts Izzy's paid in rent over any period of time.

### 3. The relationship of the benefit to the lessee to that of the reversioner

Izzy's had a maximum of 13 years left on the lease at the time of trial in 2020. Given LMA's early termination option and looking at the actuarial data the trial court judicially noticed (putting aside Freeman's testimony about health problems), one would expect the lease to be subject to termination in 2028.

Though the testimony at trial was not exactly precise, Hughes indicated the roof would last 20 years, and the seismic retrofitting would extend the building's life by what we read to be an even greater "many" years. Given the uncertainty in the lease term, and the fact that the retrofit would benefit LMA for a minimum of seven years past the end of the longest possible lease term, this factor suggests a rational intention to make LMA responsible for compliance costs. (*Hadian*, *supra*, 8 Cal.4th at 848 [primary benefit of work would be to building owner where seismic retrofit would last more than five years remaining on lease].)

### 4. Nature of curative action

Hughes's testimony at trial indicated the required work was "mostly structural." *Brown* and *Hadian*, which both involved structural compliance work and "virtually identical lease[s]," did not treat the structural nature of the work as reason to infer the tenant should not be responsible for the cost. *Brown* expressly rejected the notion that the structural nature of compliance work gave rise to an inference it should be excluded from a tenant's responsibility. (*Brown*, *supra*, 8 Cal.4th at 833 [reasoning that the lease agreement, which shifted responsibility for all repairs to

the tenant and "d[id] so in an overall context supporting the conclusion that the parties intended the [tenant] to assume the burdens of compliance and repair," negates the argument that structural alterations should not be within the tenant's obligations].) *Hadian*, in some contrast, noted the work was structural but did not say which way that cut. (*Hadian*, *supra*, 8 Cal.4th at 848-849.) We will adopt the same bottom line here, treating the elements of structural work that would be required on the premises as a point that does not favor inferring the tenant was not meant to bear the cost of the work. In other words, this factor does not affect our analysis one way or the other.

> 5. *Degree to which the lessee's enjoyment of the premises will be interfered with while the curative action is being undertaken*

The record indicates Izzy's operates 24 hours a day, 365 days a year. This means there are no "off" hours for the deli. The seismic retrofit work will necessarily occur during hours in which Izzy's is or would otherwise be serving customers.

Hughes testified the retrofit work would take approximately three to four months. He thought at least some of the work might be able to be done from above the acoustical ceiling, such that the deli could in theory remain open to customers while the retrofit was completed. He was not certain, however, about any of the details. The trial court found Hughes's testimony unpersuasive because it did not appear to be based upon well-founded assumptions about the nature and extent of the interference with the deli's operations. We review this finding of fact for substantial evidence and conclude it is

29

sufficiently supported. (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026.) Hughes's testimony was based on preliminary plans and his assertions regarding how he would perform the work without impacting the deli's operations were expressed as a "hope[ ]"; he also admitted, at one point, that the impact of the work on the tenant was "to be determined." We accordingly infer, particularly in light of the nature of Izzy's operations, that the necessary seismic renovations will be at least somewhat intrusive to the operation of the business.

LMA argues *Brown*'s reasoning compels us to conclude that where a tenant has agreed to a broad repair clause, it cannot avoid its obligation to pay for repairs based on the claim that the repairs will interfere with its business. *Hadian*, however, concluded (with a nearly identical lease) that in the absence of evidence regarding the extent of the interference, it could surmise seismic retrofit work would not be "*un*intrusive," and the factor did not favor the property owner. (*Hadian*, *supra*, 8 Cal.4th at 849.) We treat the factor as one moderately favoring owner responsibility for seismic retrofitting compliance.

> 6. *Likelihood that the parties contemplated the application of the particular law or order involved*

The parties executed their original lease in 1973, more than forty years before the Santa Monica Ordinance became law. There is no evidence in the record that either party was aware such an ordinance could be passed when the lease was initially signed. Nor does the record contain any actual evidence charging either party with such knowledge over the years (though it was, of course, common knowledge that large earthquakes hit the Los

30

Angeles area). Given the absence of evidence in the record, this factor does not favor either party.[12]

### D. Conclusion

To sum up our review of the *Sewell* factors, we have uncertainty about the remaining lease term, which, depending on whether the operative contingency occurs, could be as short as four years; we have a retrofit at this stage of the tenancy that seems quite costly; we have the substantial benefit to LMA of retrofitting construction; and we have an adverse impact of retrofitting work on the operation of the 24-hour deli. There are no *Sewell* factors that would support an inference the parties intended Izzy's to pay for the contemplated seismic retrofitting work. Thus, adding our *Sewell* factor consideration to our earlier step-one observations about the features of the lease itself, we conclude the trial court was correct in finding LMA responsible for the seismic retrofit of the building on the premises.

---

[12] Though both parties argue they were or should have become aware of the possibility that a seismic retrofit ordinance would affect the property at some point over the years, neither points to any evidence the other was put on notice. This is in contrast to the situation in *Brown*, where the lease contained a written notice warning the lessee it was possible the property contained hazardous material, including asbestos. (*Brown*, *supra*, 8 Cal.4th at 818, fn 1.)

DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:



MOOR, J.



FEUER, J.[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.